(No. 23215.—

WILLIAM J. SCALES, Appellee, *vs.* MARSHALL I. McMAHON *et al.* Appellants.

*Opinion filed October 14, 1936—Rehearing denied Dec. 2, 1936.*

GEORGE McMAHON, for appellants.

OWEN, O'MALLEY, McKEOWN & ALLAN, and McCARTHY & TOOMEY, (JOHN OWEN, JAMES C. O'BRIEN, JR., and FRANCIS J. McGREAL, of counsel,) for appellee.

Mr. JUSTICE SHAW delivered the opinion of the court:

This is an appeal from the superior court of Cook county on behalf of Marshall I. McMahon individually and as trustee and also as administrator of the estate of Daniel J. McMahon, deceased, and by Susie J. McMahon, Daniel J. McMahon, Jr., Dorothy Zimmerman, Edwin B. Zimmerman, Rose Stickelmaier and Henry Stickelmaier, as heirs-at-law of Daniel J. McMahon, deceased. The decree required the administrator, trustee and heirs-at-law of the deceased to assign and deliver certain securities to the complainant and also to quit-claim certain real estate to the complainant on account of a trust agreement executed by Daniel J. McMahon in his lifetime and pursuant to an accounting had thereunder.

The facts as stated by appellants and admitted to be substantially correct by appellee are as follows: Daniel J. McMahon, deceased, who died July 21, 1931, was for many years a practicing lawyer in Chicago, and in March, 1910, William J. Scales, appellee, retained him to collect $4000 on a note executed by John Kerley. At that time Scales was negotiating for the purchase of a piece of real estate in Chicago, located on St. Lawrence avenue, for $6500, upon which he desired to make a down payment of $1500 and pay the remainder by encumbrances. After considerable negotiations McMahon advised Scales that Kerley was unable to pay the note in full but that he would effect a settlement by the payment of $500 in cash and turning over to Scales four parcels of unimproved real estate in Chicago for the balance. This arrangement, according to complainant's bill, was unsatisfactory to Scales, as it would not provide him with the $1500 necessary to make the down payment on the property that he contemplated purchasing, and thereupon McMahon advised Scales that that was the best settlement that could be effected with Kerley, and McMahon agreed to loan Scales the sum of $1000 to make up the difference in the down payment. This

arrangement was accepted by Scales, the $500 was paid by Kerley, the four unimproved parcels of real estate were conveyed to Scales, and the settlement was made. Immediately thereafter, Scales still being badly in need of money, turned to McMahon, who had assisted him previously, and sought further help in connection with the payment of mortgages, taxes and assessments, not only on the four parcels of property herein involved but also on his home on St. Lawrence avenue. Scales assumed the $900 mortgage that was on one of the four parcels of land and retained possession and ownership of the property for a period of about five and one-half years, until October 30, 1915.

In connection with the transfer of the four parcels of real estate of Kerley to Scales and in the purchase of the real estate on St. Lawrence avenue there was considerable expense and McMahon made certain advances to Scales in this behalf and also borrowed certain money for Scales and put it into the four parcels of real estate and the property on St. Lawrence avenue for Scales. Among other advances made by McMahon and paid out by him on behalf of Scales was the sum of $1600 borrowed by McMahon from Johanna Temple on July 1, 1912; the sum of $1000 borrowed by McMahon from M. McMahon on January 1, 1913, and the sum of $3500 borrowed by McMahon from Ida Mayer on September 9, 1913, through a loan on the Scales property on St. Lawrence avenue, amounting to $3500. This sum of $3500, together with $132.21 of McMahon's own money, was paid the same day to the Woodlawn Trust and Savings Bank to pay off a mortgage and interest on the Scales property on St. Lawrence avenue. The total amount of the indebtedness of Scales to McMahon for money advanced and paid out by him on behalf of Scales on October 30, 1915, amounted to $6000 or $7000, for which McMahon had no security. At that time, on October 25, 1915, McMahon advised Scales by a letter that

he could advance no more money and desired Scales to pay that advanced.

On October 30, 1915, Scales, in consideration of the money advanced, interest and services, conveyed the four parcels of real estate involved in this case to McMahon. All four parcels were vacant and unimproved and were situated in what is known as the South Shore district of Chicago. It is alleged by the complainant and found by the master and chancellor, that at that time McMahon gave a letter to Scales stating that the real estate was conveyed to him as security for advances made, interest and services. This letter is claimed by defendants to be a forgery. McMahon took full charge of the four parcels of property. Jeremiah S. Kenny made claim that one of the parcels which had been conveyed by Kerley to Scales was not owned by Kerley and that he, Kenny, was a half-owner of the same, and on July 19, 1922, McMahon and his wife executed a deed to Kenny for an undivided one-half interest in it. McMahon also paid all of the taxes and special assessments on the real estate in controversy and on other property owned by Scales, none of which money was ever paid back by Scales. In September, 1926, McMahon sold one of the parcels of real estate for approximately $21,000, represented by a cash payment of $5853 and a second mortgage on a piece of real estate. This mortgage was subsequently paid in full. At the time this transfer was made McMahon partially reimbursed himself for moneys due him. Later, parcel No. 3 was sold for the sum of $20,000, on which there was a cash payment and a mortgage for $12,000, of which McMahon was entitled to one-half, the other half belonging to Kenny. On October 9, 1930, parcel No. 4 was sold for $5100—a part in cash and the balance by a mortgage of $4000. The unpaid taxes, interest and incidental expenses against the property to convey good title were considerable and were paid by McMahon, and left a net cash balance due McMahon, not de-

nied by complainant, as of October 9, 1930, in the sum of $20,021.53. Between 1910 and 1932 McMahon and his heirs advanced certain other sums of money in behalf of Scales, and it was stipulated that Daniel J. McMahon, Jr., one of the defendants, made several disbursements in behalf of complainant which were proper credits to the account of Daniel J. McMahon, deceased. It was stipulated that on August 5, 1930, McMahon advanced $200 to Scales, and that Scales executed and delivered his judgment note payable to the order of McMahon in the amount of $200; also, that on September 13, 1930, McMahon advanced the sum of $100 to Scales and that Scales executed and delivered his judgment note payable to McMahon in that sum. These items were never paid by Scales or offered to be paid.

The letter of October 30, 1915, upon which plaintiff relies and which defendants claim to have been forged, was written upon the law office stationery of Daniel J. McMahon, and, exclusive of the printed head, was as follows:

*"October 30, 1915.*

"Mr. WILLIAM J. SCALES, 6337 St. Lawrence Ave., Chicago, Illinois.

"DEAR SIR—In reference to the deeds signed by·Mrs. Scales and yourself this day conveying four pieces of property to me, I write to say that the said deeds are accepted by me as security for the moneys advanced by me for you, together with interest thereon, and also for such charges for services as I am reasonably entitled to. Of course, if the property is sold by me I will render an account to you as to the disposition of the proceeds.

"Yours very truly,　　　　　　D. J. McMAHON."

The contentions of appellants may be grouped under four headings: (1) That the letter copied above was a forgery; (2) that the court erred in admitting specimens of handwriting for comparison by expert witnesses; (3) that even if genuine, the letter above quoted and the record in connection therewith formed an insufficient basis to establish a trust; and (4) that, regardless of the other three points, improper rules and methods of accounting were adopted and applied by the chancellor.

We think the record, considered as a whole, fully sustains the findings of the master and the chancellor that the signature to the letter was genuine. The arguments against it are based upon the testimony of two women who had worked as stenographers for the deceased a number of years prior to the trial and that in their opinion it was not McMahon's signature. While their testimony is entitled to some weight, it was, nevertheless, as to each of them, somewhat impaired upon cross-examination. It is also urged that the signature in the photostatic copy of the letter which appears in the record is enough different from other signatures of McMahon which are also shown in the same way, for us to form an independent judgment that it is not genuine. There certainly are apparent differences in different signatures of McMahon shown by the record, but there are also obvious similarities and tendencies in the various writings, and we would not feel justified in reversing the master and chancellor from anything apparent to us. On the other hand, considering the entire record, we feel that no other conclusion can be arrived at than the one reached by the trial court. A fully qualified handwriting expert testified that the signature was genuine. Some of the defendants who testified and who were entirely familiar with McMahon's handwriting did not deny its genuineness. The deeds to the four parcels of real estate which were conveyed to McMahon bore even date with the letter, which fact is a strong corroborating circumstance. Even stronger, however, is the corroboration afforded by McMahon's account book which was introduced in evidence. From that it appears that from April 27, 1910, to the time of his death McMahon kept a very meticulous record of his transactions with Scales. There are more than two hundred entries in the book, most of them in McMahon's own handwriting, and the entries cover every form of transaction between the parties, such as charges for legal services, advances for the payment of taxes, ad-

vances for the payment of interest, advances for the payment of mortgages and cash loans to Scales. On the date of the letter and deeds, the account book shows that Scales was indebted to McMahon to the extent of more than $4000, and on the same date McMahon made a further advance to Scales of $1648. The day following—*i. e.*, November 1, 1915—appears the following entry: "Services prep. deeds to D. J. McMahon as secur. ex. & rec.—$10.00." The trial court arrived at a correct conclusion on the facts.

Appellants cite paragraph 51 of chapter 51 (State Bar Stat. 1935, p. 1622,) and complain because the court permitted the expert witness to express an opinion as to handwriting from the comparison of signatures. That paragraph provides, in substance, that before a standard of writing shall be admitted for comparison the opposite party shall first be given notice thereof, and the following paragraph provides for a reasonable opportunity for the opposite party to examine the standards that are to be used. Appellants' objections are entirely without force for a number of reasons. In the first place, their objection to the introduction of the deeds in question was not based upon this ground. In the second place, paragraph 50, of the act expressly provides that comparison may be made from other admittedly genuine documents in the record; and in the third place, the genuineness of the signature is sufficiently proven by other evidence.

The third point raised by appellants must likewise be overruled. They argue at great length, and cite many authorities to sustain a contention, that the letter and the record are not sufficient to establish a resulting trust. There is no occasion for reviewing or discussing their authorities because no question of resulting trust is involved. The record clearly and sufficiently proves an express trust, which requires no particular form and may be established through letters, memoranda or other writings of the most informal nature. *Fox* v. *Fox*, 250 Ill. 384.

The fourth objection of the appellants must be sustained. Neither party has assisted the court by the citation of any authorities, but from our own research we are convinced that a wrong method was used in computing the amount due. It appears from the brief of appellee that interest was calculated on each item of debit from the date of entry to the end of the account and charged against Scales, and that interest was likewise calculated on each item of credit from the date of the credit to the end of the account, and the amount of interest due was taken as the difference between these two figures. In the case of *Story* v. *Livingston*, 13 Pet. 359, 10 L. ed. 200, the Supreme Court of the United States laid down what is known as the United States rule in the following words: "The correct rule as to interest is, that the creditor shall calculate interest, whenever a payment is made. To this extent the payment is first to be applied, and if it exceed the interest due, the balance is to be applied to diminish the principal. This rule is equally applicable, whether the debt be one which expressly draws interest, or on which interest is given as damages." In 33 Corpus Juris, at page 250, this rule is stated with the assertion that it is sustained by the courts of last resort in thirty-three States, and it has heretofore been adopted by this court. (*McFadden* v. *Fortier*, 20 Ill. 509; *Heartt* v. *Rhodes*, 66 id. 351.) The rule adopted by the court below is known as the mercantile rule and is not widely recognized. 33 Corpus Juris, 251.

The decree of the superior court will be affirmed in all respects except as to the method of accounting. In that respect it will be reversed and the cause remanded, with directions to compute and state the account between the parties in accordance with the rule as to computing interest hereinabove set forth.

*Affirmed in part and reversed in part*
*and remanded, with directions.*