Steven Humpa et al., Appellants, v. Russell W. Hedstrom, Appellee.

Gen. No. 44,628.

Heard in the second division of this court for the first district at the December term, 1948. Opinion filed October 10, 1950. Rehearing denied November 1, 1950. Released for publication November 2, 1950.

WILLIAM PARKER WARD, of Chicago, for appellants.

DILLARD B. BAKER, of Chicago, for appellee.

MR. JUSTICE FRIEND delivered the opinion of the court.

Steven Humpa and nine other former employees of the Oscar W. Hedstrom Corporation filed their amended complaint in equity to recover monies from the Oscar W. Hedstrom Corporation Profit-Sharing and Employees' Savings Trust and Russell W. Hedstrom, trustee, and also asked for discovery, accounting and other relief. The corporation, having subsequently been adjudged bankrupt, was dismissed as a party defendant. Trial by the chancellor resulted in dismissal of the complaint for want of equity, and plaintiffs appealed.

The Hedstrom Corporation, a metal-processing concern, was founded in July 1940 to succeed a former partnership, the Hedstrom Pattern Works, engaged in a similar business. By the summer of 1945, Russell W. Hedstrom and members of his family had acquired all but 15 per cent of the stock. Government contracts in 1942 had yielded large profits for the company, and

606

in the spring of 1943, after consultation with accountants and counsel, an employees' profit-sharing and pension plan was established. At a company-sponsored banquet in July 1943, the officers of the corporation presented each eligible employee with a profit-sharing account book outlining the trust and containing figures for the individual participant's account. Subsequently two deposits of approximately $33,000 and $56,000, respectively, were made in the trust in a separate trust bank account, each representing 20 per cent of the corporation's net income, before Federal income taxes, and computed according to the formula set forth in the trust instrument to which the corporation was a party. The company's fiscal year ended June 30, and the deposits represented the employees' share for the periods ended June 30, 1943 and June 30, 1944. Working papers, signature cards, and accounts for the 86 members were maintained for the trust. Subsequent entries were made in members' books for additional credits for profits and for forfeitures created through former members' partial loss when they ceased to be employees.

The trust instrument provided for three trustees, but any two could take action. Russell Hedstrom had been a trustee from the inception of the trust; the company's comptrollers, Carl Olson, and later, Elmer Paulson, were at times also trustees. Charles Hague was elected by the employees at the banquet in July 1943 as a third trustee. The record discloses that there were no regularly scheduled meetings, nor was there any place specially designated for meetings. No written notices of meetings were ever given by Russell Hedstrom to the other trustees. Apparently the only meetings had were at times when the corporation needed money, when funds were taken from the trust and loaned to the company. Charles Hague testified that he was never notified of any meeting, whereas

607

Russell Hedstrom stated that he told Hague on one or two occasions that there would be a meeting in several hours' time. No copy of the trust instrument was ever given or made available to the participants to inspect, and although promises were made to produce it, both before and after suit was filed, it was finally furnished to plaintiffs only under order of court after proceedings for contempt for failure to produce had been instituted.

Prior to December 1943, there had been placed in the trust fund approximately $89,000. Subsequently the corporation needed funds to pay its income taxes. It was supposedly financially sound, but its funds were tied up in work in process, and payment was due from the Navy under contracts which had been assigned or pledged to a bank for loans. At a meeting held December 20, 1943, at which only the comptroller trustee and Hedstrom were present, $30,000 was taken from the trust and given to the corporation to pay corporate income taxes. The same situation existed a year later in December 1944; at that time $56,000 was transferred. No attempt had been made on behalf of the corporation to borrow funds on the commercial market. Materials were constantly mortgaged, and the war contracts were assigned to a bank. No minutes, records or notes of the transactions had at these meetings were ever made. For the respective sums of $30,000 and $56,000 taken from the trust funds, Russell Hedstrom gave the trust two notes on behalf of the corporation, signed by him as president and treasurer, which were filed with the trust records. Each of these notes called for payment of principal five years after date, with interest at five per cent per annum, and contained a confession clause. After the first loan the balance in the trust account was about $3,000, and it so remained until December 1946. Hedstrom testified that the corporation gave the trust a note for one

year's interest on the first loan at the time of the second loan, but no interest was actually paid to the trust on either of the loans.

In July 1945, the government lodged a claim against the corporation for renegotiation on the 1943 contracts. After adjustment of income credits for taxes already paid, the amount owed was fixed by negotiation at $115,000. By June 30, 1946, the first renegotiation bill for the year ended June 30, 1943, had been paid, but by that time a second bill in the amount of $270,000 had been presented to the corporation, and its net worth had been wiped out. The general creditors, excluding the trust estate, had claims against the corporation for about $100,000 for goods and merchandise delivered over the previous twelve-month period, and its bank balance was only $387.

The second renegotiation bill was adjusted finally after bankruptcy adjudication of $100,000. The company was automatically given a tax credit on this transaction. No monies were paid by the corporation on the second bill, but the final figure became a claim against the bankruptcy estate in the sum of $20,000, that being the maximum percentage allowed by the excess-profits law. The 20 per cent contributions to the trust, as adjusted under the renegotiation proceedings, would have aggregated $56,000.

In an effort to alleviate its financial difficulties, three separate mortgages were given to the Merchants Acceptance Corporation for loans, pledging all the personal property of the company, together with its good will, and various parcels of real estate were conveyed by the members of the Hedstrom family to the corporation. The details of these vain efforts to rescue the business are not material to the issues involved.

In June 1946, in the presence of Paulson, then a trustee and the comptroller of the corporation, Russell

W. Hedstrom canceled the original notes of the corporation to the trust in the respective amounts of $30,000 and $56,000, and signed two new notes of like amounts, due five years thereafter. There was apparently no discussion concerning the advisability of extending the loans or of obtaining security for the trust, nor was any notice given to the third trustee. No minutes or records were kept of the transaction. The new notes had yearly interest coupons attached and contained a cancellation clause, but no provision for confession of judgment. Hedstrom signed the notes and then placed them with the trust papers. At the same time Hedstrom signed a note for $4,300 to the trust, representing interest due on the two notes marked paid and canceled.

The instant proceeding was filed October 9, 1946. In December of that year Hedstrom transferred the sum of $1,700 from the trust to the corporation to pay a bill of the corporation for materials. There was no formal notice to the trustees, and no minutes were kept of the transaction. Paulson and Hedstrom both knew that the corporation had no funds. Several days later Hedstrom as president signed a note for $1,700, due five years after date, payable to the trust. The present balance in the trust is $435.33.

In December 1946, a bankruptcy petition was filed against the corporation. Hedstrom did not file any claim against the bankruptcy estate on behalf of the trust. His reason for not doing so, as he stated, was that all profits of the corporation had been wiped out by the renegotiation so that there was no trust.

The investments authorized by the trust included government bonds, investments approved by Illinois law for insurance companies, and bonds and debentures of any corporation, including those of the Oscar W. Hedstrom corporation. The trust instrument also provided that when the corporation should fail to con-

tribute for any two successive years, the trust would terminate and the employees' accounts become 100 per cent vested. Under the terms of the trust the corporation has no reversionary interest in the trust.

■ Although defendant makes and argues ten separate points in support of the decree, the controversy resolves itself into two principal questions: (1) was there an existing trust; and (2) if so, did the trustees, in good faith, perform within the provisions of the trust. Defendant argues that since the trust instrument was never fully executed by the corporation nor signed by any of the trustees or beneficiaries, no trust existed. However, the failure to sign the trust instrument in this case was the only formality lacking. A trust instrument was prepared on advice of accountants and counsel; the board of directors of the corporation adopted it, and they and the officers of the corporation conducted their operations in accordance with its provisions. Books and records were installed and maintained for several years. Funds were set aside into separate bank accounts, and membership account books advising the *cestui que* trusts of the general provisions, and containing various entries of the members' accounts, were distributed and maintained. Amendments were enacted to conform to the United States Treasury Department requirements to have the contributions allowed as deductible corporate expenses. Trustees were selected and operated the trust by means heretofore described to comply with the trust instrument and amendments. As to one of the plaintiffs, a payment of a share of his account was made out of the trust funds, and Russell W. Hedstrom testified by deposition that he signed the instrument. It is significant that at the conclusion of the hearing the chancellor who heard the evidence found that the trust came into legal existence, and the corporation and its officers ratified it by statements contained in

611

the employees' books and by depositing monies to the creditors of the trust. He also found that Hedstrom as trustee assumed control of its affairs, and conducted them as though the assets were company property rather than an independent trust. From an examination of the record, we are satisfied that these findings are amply sustained by the evidence. By the acts of the corporation and the trustees an express trust was created for the benefit of the participants; no particular formality was necessary. *Osborn v. Rearick,* 325 Ill. 529; *Scales v. McMahon,* 364 Ill. 413; *Albert v. Albert,* 334 Ill. App. 440.

Defendant relies principally upon the terms of the trust instrument which provide that the trustees shall have power to invest the trust estate or any part thereof in "debentures of any corporation, including bonds and debentures of the Oscar W. Hedstrom Corporation," and his counsel argues that a debenture may be a simple acknowledgment or promise to pay like a promissory note, and by means of dictionary definitions attempts to show that the word "debenture" does not import a secured indebtedness, and that the notes placed in the trust were debentures authorized as investments by the trustees within the terms and contemplations of the trust instrument. The authors of Corpus Juris Secundum (25 C. J. S. Debenture page 1302) state that, although never legally defined, debenture is included under one of three descriptions: "First, a simple acknowledgment under seal of the debt. Second, an instrument acknowledging the debt and charging the property of the company with repayment. Third, an instrument acknowledging the debt, charging the property of the company with repayment, and further restricting the company from giving any prior charge. Having in mind this classification, the term may be said to signify a debt; an acknowledgment of a debt, in the nature of a bond or bill, etc.; a promise

to pay a fixed sum of money; a security, or promise to pay, for a loan of money issued by a public company, usually creating a charge on the whole or a part of the company's stock and property, although not necessarily in the form of a mortgage; an agreement by which a right in equity to a charge or security on personal chattels is conferred; an instrument, generally under seal, for the repayment of money lent, usually if not exclusively used of obligations of corporations or large moneyed copartnerships, issued in a form convenient to be bought and sold as investments; an instrument importing an obligation or covenant to pay, in most cases at the present day accompanied by some charge or security, although, as has been said, the word does not necessarily imply a secured debt or claim, but, from the context, it may be construed as doing so, the nature of the obligation following the terms of the agreement or plan under which it is issued; an instrument in the nature of a mortgage, to secure a certain sum of money, with interest, to which coupons are attached making the interest payable half yearly, the term 'debenture' including the entire instrument of obligation, consisting of the body wherein is set forth the obligation as to repayment of the principal sum, together with the coupons attached thereto.''

■■■■■ The chancellor noted that the by-laws of the trust expressly authorized the trustees to invest assets in bonds and debentures of the corporation, but found ''that the notes given herein were not bonds or debentures and that the payment was not an investment.'' Read as a whole, the provisions of the trust authorizing investments indicate that only sound securities were to be purchased. The notes in question were not in fact or in good faith a purchase within the meaning of the trust instrument. Defendant seeks to have us interpret it as giving the trustees authority to do any

act spelled out in the trust, to disregard all motives and considerations, in deciding whether the beneficiaries' monies had been properly handled, and to be guided by the letter of the document, rather than by its true intent and meaning. Established principles of equity do not permit of such interpretation. In Pomeroy's Equity Jurisprudence, 5th ed., vol. IV, sec. 1062, p. 171, the author states that ''a trustee can use the property only for the purposes contemplated in the trust, and must conform to the provisions of the trust in their true spirit, intent, and meaning, and not merely in their letter.'' A trustee subjects himself to those obligations of fidelity and diligence that attach to his office, and any discretion vested in him under the trust instrument does not relieve him from obedience to the great principles of equity which are the life of every trust. *Carrier v. Carrier,* 226 N. Y. 114, 123 N. E. 135.

 Hedstrom, acting in the dual capacity of president of the corporation and owner of most of the corporate stock, as well as trustee, knew that his company could not secure funds on the commercial market without a mortgage or assignment; nevertheless these loans were made on simple promises to pay which Hedstrom as president signed and gave to himself as trustee. When the original notes were canceled in June 1946 and new notes given, the corporation was patently insolvent, and Hedstrom was fully cognizant of the fact. All his transactions between the corporation and the trust were conducted practically without consultation with the other trustees and without notice of meetings at which such matters might have been submitted and considered with his cotrustees; he acted alone, and *was in reality dealing with himself.* Under the established law a trustee is prohibited from dealing with his trust property in a dual capacity. In *Campbell v. Albers,* 313 Ill. App. 152, the trustees were

also managing officers of a bank in which they deposited funds of the trust. The court concluded "that the bank, of which the trustees were the managing officers, sorely needed the money of the trust, and they elected to take the risk of an investment not permitted by law to bolster up the failing condition of the bank for their own benefit. A trustee is not permitted to place himself in a position where it will be difficult for him to be honest and faithful to his trust. [Citing cases.]" The *Campbell* case also involved the purchase by one of the trustees of bonds of the Hotel Sherman in Chicago upon the recommendation of a Chicago bank. The trustee made no investigation nor any independent inquiry about the bonds. It was shown upon the hearing that the taxes were in default when the bonds were purchased. The court stated that the bonds were not a safe investment, and that "the facts indicate that a proper investigation would have so disclosed." Referring to chapter 148, paragraph 32 of the Illinois Revised Statutes 1941 [Jones Ill. Stats. Ann. 135.05], relating to the investment of trust funds by trustees in first mortgage bonds of any corporation upon which no default in payment of interest shall have occurred for a period of five years, the court said that the statute did not purport to sanction or permit such an investment where the bonds were otherwise unsafe or to excuse the trustees from making a proper investigation as to the safety and propriety of such an investment. "The statute was designed to protect the beneficiary and not to shield the trustee from an improper investment through a failure to perform the duties of his trust."

As an indication of the lack of prudence of the trustee in the case at bar it should be noted that the monies of the trust were loaned on a five-year basis to a three-year-old corporation which had made profits for only two of those years. Paragraph 32, chapter

148, Illinois Revised Statutes 1949 [Jones Ill. Stats. Ann. 135.05], is an expression of the policy of this state in regulating investments by trustees. It provides that a trustee "shall exercise the judgment and care under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital. Within the limitations of the foregoing standard, the trustee is authorized to acquire and retain every kind of property, real, personal or mixed, and every kind of investment, including specifically but without in any way limiting the generality of the foregoing, bonds, debentures and other corporate obligations, stocks, preferred or common, and real estate mortgages, which men of prudence, discretion and intelligence acquire or retain for their own account, and within the limitations of the foregoing standard, the trustee is authorized to retain property properly acquired, without limitation as to time and without regard to its suitability for original purchase."

Defendant argues that he did not profit personally at the expense of the corporation or of the trust; that the trust was only a generous gesture on the part of the corporation, depending on corporation profits for its corpus; that plaintiffs contributed nothing to it; and that the trust was wholly dependent upon future profits of the corporation, if any, which in turn had to be kept going as a successful enterprise in order to earn profits. In other words, he takes the position that since the trust was created from corporate funds during a period of prosperity, it was not a violation of trust principles to loan them back to the corporation without security in times of adversity, and that strict equitable principles should not be applied to his transactions. By analogy, a trust created by a father for

616

his children may likewise be termed "a generous gesture" on the part of the settlor; nevertheless, if the "generous" settlor is also a trustee, the law views him solely in his role of trustee, and exacts of him in the management of the trust funds that care and prudence usually required of trustees in the performance of their duties. If the parent, after creating the trust, became a pauper, that fact would not destroy the trust.

We hold that under the facts of this case and within the contemplation of the trust instrument, the unsecured promissory notes of the corporation to the trust were not debentures; that the corporation, possibly because of adverse circumstances not under its control, was nevertheless insolvent; and that the substitution of its notes for $86,000 in cash in the trust fund by the trustee in the guise of an investment cannot be sanctioned by the court under the established principles of equity.

In the light of these conclusions the decree of the court dismissing the cause for want of equity is reversed, and the cause remanded with directions that a decree be entered for plaintiffs as prayed in the amended complaint and in consonance with the views herein expressed.

*Decree reversed, and cause remanded with directions.*

SCHWARTZ, P. J., and SCANLAN, J., concur.