MORTON S. WOLF, Appellant, *v.* GEORGE E. ROOSEVELT et al., Respondents.

Argued March 3, 1943; decided April 22, 1943.

*John Gerdes, W. Randolph Montgomery* and *Irving T. Bush* for appellant.

*Milton M. Bergerman, Herman Jervis* and *Joseph Cohen* for respondents.

LEHMAN, Ch. J. In October, 1935, the United States District Court for the Southern District of New York approved and confirmed a plan of reorganization of 59th Street & Fifth Avenue Corporation in reorganization proceedings brought under section 77-B of the Bankruptcy Act (See U. S. Code, tit. 11, § 207) in which the corporation was the debtor. The plan so approved provided that the debtor corporation should transfer its property to Sherneth Corporation, that all the capital stock of Sher-

neth Corporation be deposited under a voting trust agreement and that the voting trust certificates be distributed among those entitled thereto under the reorganization plan. The plan was carried out. The voting trust agreement was executed on May 19, 1936, but dated January 2, 1936. It provided that it was made for a term of ten years beginning January 2, 1936, and ending January 2, 1946, unless terminated sooner by unanimous vote of the voting trustees.

The voting trust was, it is undisputed, valid at the time it was made. The term for which it is made has not expired and it has not been terminated by vote of the trustees. The plaintiff, a stockholder, challenges the present validity of the voting trust agreement solely on the ground that after this agreement was made the Legislature in section 130-c of the Real Property Law (L. 1936, ch. 900, effective June 8, 1936) provided that '' No agreement appointing trustees to vote the stock of any corporation formed or used under a plan of reorganization of property shall be valid for a longer term then five years and unless it has been submitted to and approved by the court * * *.'' The primary question here presented is whether the Legislature intended that the statute should apply to voting trust agreements valid when made for a term longer than five years.

The defendants claim that the Legislature did not intend that the statute should impair the obligation created by existing agreements and that under the Constitution of the United States could not do so, especially where the agreement was made pursuant to a plan approved by a Court of Bankruptcy in bankruptcy proceedings. We may not consider or determine the scope of the limitations placed by the Constitution upon the legislative power to nullify in whole or in part existing voting trust agreements unless we determine first that the Legislature intended to exercise such power.

Even within the narrow field where legislative power to nullify or change an existing agreement is unchallenged, a statute restricting the power of individuals to create or define their rights and obligations should not be construed in manner which would affect existing agreements unless the Legislature so provided in express terms or by plain implication. The Legislature has not so provided in section 130-c of the Real Property Law. It seems plain that the condition, imposed by

the Legislature to voting trust agreements,— that they shall not be valid unless " approved by the court," could not be applied to contracts made at a time when no such approval was required by law unless it was the intent of the Legislature to terminate all existing voting trust agreements. Even the plaintiff does not contend that the Legislature so intended, nor does the plaintiff contend that the Legislature intended that agreements valid when made for a term of more than five years should be invalid when five years of the *stipulated* term had passed. The plaintiff contends only that the Legislature intended that by force of the statute voting trust agreements should become invalid when five years had passed after the statute became effective. The Legislature certainly did not say that. The language of the statute is at least inept if the Legislature intended that it should retroactively restrict the power of stockholders to enter into voting trust agreements.

The Legislature has not decreed that in the future voting trust agreements shall not be valid. It has attempted in the statute only to restrict the power of holders of securities to make such agreements in manner intended to safeguard them against dangers inherent at times in such agreements. In the future holders of securities have the choice of entering into voting trust agreements, subject to such restrictions, for a limited time or of refraining entirely from entering into any voting trust agreement. If the statute is intended to apply to agreements already made those who entered into the agreement would be bound by limitations to which they did not agree, although they might never have consented to the plan of reorganization or the voting trust agreement if the agreement had been limited to five years from June, 1936.

The judgment should be affirmed, with costs.

CONWAY, J. (dissenting). In a reorganization under section 77-b of the Bankruptcy Act, in which 59th Street & Fifth Avenue Corporation was the debtor, a plan of reorganization was approved and confirmed by order of the U. S. District Court for the Southern District of New York under date of October 25, 1935. The property of the debtor was transferred under the plan to the Sherneth Corporation, a New York corporation. The plan provided, among other things, for a voting trust of

all of the capital stock of Sherneth Corporation and all of said capital stock was deposited with voting trustees under a voting trust agreement dated January 2, 1936. That agreement was made for a term of ten years ending January 2, 1946, unless sooner terminated. It has not been renewed or extended.

The plaintiff is the owner of voting trust certificates representing shares of stock in Sherneth Corporation. He brings this action seeking a declaratory judgment that the voting trust agreement has ceased to be enforceable by virtue of the provisions of section 130-c, subdivision 2, of the Real Property Law. He also seeks a direction to the voting trustees to issue and deliver to him the shares of stock represented by his voting trust certificates. That latter direction would be too broad. Plaintiff would be entitled to that, as we shall see, only if the defendants were unable to rally fifty-one per cent of the stockholders of Sherneth Corporation to support of the continuance of the voting trust agreement or to the execution of a new one.

Plaintiff moved for judgment on the pleadings at Special Term. The motion was denied and judgment entered dismissing the complaint. That judgment was unanimously affirmed by the Appellate Division and an appeal therefrom is here by our permission.

There are two statutes which must be considered by us. The first is section 50 of the Stock Corporation Law which provides in part as follows: " § 50. Voting trust agreements. A stockholder, by agreement in writing, may transfer his stock to a voting trustee or trustees for the purpose of conferring the right to vote thereon for a period not exceeding ten years upon the terms and conditions therein stated."

The other statute is section 130-c, subdivision 2, of article 4-A of the Real Property Law, chapter 900 of the Laws of 1936, effective June 8, 1936. It reads as follows: " § 130-c. Voting trustees and voting trust agreements

\*　\*　\*　\*　\*　\*　\*

" 2. No agreement appointing trustees to vote the stock of any corporation formed or used under a plan of reorganization of property shall be valid for a longer term than five years and unless it has been submitted to and approved by the court and no trustees appointed by such agreement shall continue to act thereunder after the expiration of its term, unless and

until a new or an extension agreement has been entered into and received the affirmative approval of the holders of at least fifty-one per centum of the stock.''

The questions we must determine are whether the enactment of section 130-c, subdivision 2, limited the unexpired term of voting trust agreements which were still executory in part to a five year period of validity or enforceability running from the effective date of the statute, June 8, 1936, when such agreements were executed prior to that effective date. A second question which we must determine is whether the granting of the relief sought by this action would interfere with provisions of the State or Federal Constitution.

Concededly, section 130-c, subdivision 2, is applicable to agreements made after the effective date of the statute. The question whether the Legislature intended it to apply only to agreements made after such effective date and not to executory agreements then existing is one of legislative intent and not legislative power. Under its reserved power, the legislature has power to limit the enforceability of, or to terminate, existing voting trust agreements affecting stock of New York corporations. (*Matter of Morse* [*Bank of America*], 247 N. Y. 290, 304; N. Y. Const., art. X, § 1; General Corporation Law, § 5.) When the Legislature grants the privilege of severing the voting right from the beneficial ownership of shares of stock of a New York corporation, the grant is subject to the reserved right of the Legislature to withdraw or modify that privilege at any time. When the Legislature takes it away or imposes conditions upon the continuance of that privilege, there is no interference with vested contract right or property right. There was in the voting trust agreement an implied provision that the privilege should terminate when the Legislature saw fit to terminate it. When the Legislature announces by an enactment a change in the public policy of the State and withdraws or imposes conditions upon the continuance of the privilege, the parties to the agreement are considered to have contemplated such an occurrence. '' Nor can it be said that the trustees have acquired any property interest under the voting trust agreement of which they are deprived by the statute. The trustees exercise certain voting powers, not for their own benefit, but for the benefit of the stockholders and the corporation. They

have no beneficial interest in the stock and thus their right or interest lacks those elements of ownership which are so associated in our minds with the idea of property as to be beyond the legislative power or control. (*Metcalfe* v. *Union Trust Co.*, 181 N. Y. 39, 44.)'' (*Matter of Morse* [*Bank of America*], 247 N. Y. 290, 304.)

It is true that in the *Morse* case banking was affected and, as was there said, banking is a business affected with a public interest but that cannot affect the fact that *all* voting trusts '' are recognized and regulated by statute. Whether they would be valid at common law in the absence of a statute defining and regulating them is immaterial. Public policy in regard thereto is defined by the Legislature. Between the conflicting rules of the common law, a choice has been made. No voting trust not within the terms of the statute is legal and any such trust, so long as its purpose is legitimate, coming within its terms is legal. The test of validity is the rule of the statute. When the field was entered by the Legislature it was fully occupied and no place was left for other voting trusts.'' (*Matter of Morse* [*Bank of America*], 247 N. Y. 290, 298.) The amendment we are considering merely regulates the manner in which the stock of a corporation formed or used under a plan of reorganization of real property shall be voted by voting trustees and since it '' does not affect the property of the corporation or its objects, it comes within the reserved power to amend corporate charters so as to regulate methods of administration and details of procedure in the interest of the public and of all concerned. (*Lord* v. *Equitable Life Assur. Society*, 194 N. Y. 212.)'' (*Matter of Morse* [*Bank of America*], *supra*, p. 304.)

The Legislature was of the opinion, at the time of the enactment of section 130-c, subdivision 2, that corporations formed or used under a plan of reorganization of real property were also affected with a public interest. Article 4-A of the Real Property Law of which section 130-c, subdivision 2, forms a part was enacted immediately following an investigation by a sub-committee of the New York Legislature known as the Streit Committee (N. Y. Leg. Doc. [1936] No. 66). The article was popularly known as the '' Streit Act '' and was intended to remedy what the Legislature considered to be abuses, as described in the Committee Report, in the use of voting trusts. The remedy adopted

by the Legislature was a simple and reasonable one. It was a provision that a voting trust agreement involving the stock of a corporation used in the reorganization of real property (permitted for a ten year period under Stock Corporation Law, § 50) could not be enforced for more than five years, unless at the end of that time at least fifty-one per cent of the stockholders affirmatively approved a continuance of the voting trust agreement or made a new one. It is difficult to conceive of the Legislature's not intending that such a remedy should be applicable to the executory provisions of existing agreements. The article provides a complete statutory scheme designed " to protect ' mortgage investments '." (*Bakers Share Corp.* v. *London Terrace, Inc.,* 130 F. 2d 157, 160.)

Curiously enough an amendment to section 130-c, subdivision 2, was proposed in the 1942 session of the Legislature by which the following would have been added: " The provisions of this subdivision shall not be retroactive and shall not be construed to apply to agreements entered into prior to June 8, 1936, the effective date of Chapter 900 of the Laws of 1936."

In reporting its disapproval of the amendment (which failed of passage), the Committee on State Legislation of the Association of the Bar of the City of New York said:

" If subdivision 2 of section 130-c is desirable legislation — which it seems to be since it is aimed at preventing voting trustees from entrenching themselves too long in control — it is hard to see why an exception should be made of voting trusts set up prior to the date when the section was originally adopted. As such adoption took place more than five years ago, any such voting trust must now have been in existence for more than the five-year period limited by the section as the term during which voting trustees may remain in control without a new mandate from the stockholders whom they represent.

" While it is undoubtedly true that voting trusts for ten years were set up in good faith before the passage of subdivision 2 of Section 130-c in 1936, and that the voting trust agreements in some, if not in all, cases, contained no machinery for such a referendum as the bill contemplates, this would seem to be no reason why the change in legislative policy embodied in the subdivision should not be applied to such situations. That change was made as the result of a legislative investigation

which revealed serious abuses; and although some of the pre-existing voting trusts have no doubt been well administered, a statute forcing voting trustees generally to make a report of their stewardship and seek a new authorization from their *cestuis que trustent* would seem to be in the best interests of the latter, who are the persons entitled to the primary protection of the law.

" An application of the requirements of subdivision 2 of Section 130-c to a pre-existing voting trust may in some cases be productive of hardship. In the main, however, the advantages of having the voting trustees accountable at an earlier date to the stockholders for whom they are acting, would seem to offset the possible expense and confusion incident to a referendum. The preservation of something in the nature of democratic control is worth the possible loss of efficiency that may in some cases ensue."

There can be no question, therefore, that agreements appointing trustees to vote the stock of a corporation formed or used *under a plan of reorganization of real property* were affected with a public interest and were so considered at the time of the enactment of section 130-c, subdivision 2, and at the time of the execution of the voting trust agreement we are considering (its execution took place between the passage of the Act and the signing of it by the Governor.)

The question then, to repeat it, is this: Did the Legislature intend that section 130-c, subdivision 2, should be applicable to the unexpired executory period of voting trust agreements where such agreements continued for more than five years after the effective date of the statute. That question would appear to require an affirmative answer by reason: a. of the express language of the statute; b. of the absence of any statement in the statute that it should not be applicable to then existing agreements although there was such statement in another section of the same article enacted simultaneously.

a. Let us take the language of the statute. It provides that: "*No* agreement * * * shall be valid for a longer term than five years." It is all inclusive. It applies to *all* agreements which would be valid for a term of more than five years were it not for the statute.

b. There is no provision that section 130-c, subdivision 2, shall not be applicable to existing voting trust agreements. Yet in section 127 of the Real Property Law passed at the same time there is this provision: " The provisions of this section shall only apply to trust indentures or mortgages hereafter entered into."

" Regulatory laws, reasonable in character, designed to accomplish a legitimate public purpose, and enacted to promote the public welfare apply even to private contract rights when the public policy is appropriately declared and defined and the two conflict. (*People ex rel. Durham R. Corp.* v. *La Fetra*, 230 N. Y. 429, 448.) " (*Matter of Morse* [*Bank of America*], 247 N. Y. 290, 303, 304. See, also, *Dillingham* v. *McLaughlin*, 264 U. S. 370, 374 and cases cited.)

Our interpretation of the legislative intent as expressed in section 130-c, subdivision 2, gives immediate prospective effect to the public policy expressed therein. It violates no rule of statutory construction. It gives effect to the legislative command that it " shall be construed liberally to effectuate its purpose." (Real Property Law, § 130-h.) Such interpretation does not require a holding that all voting trust agreements made prior to the enactment of section 130-c, subdivision 2, which had not received court approval are void. It should be sufficient to point out that that question is not here presented since the agreement in the instant case had court approval. Apart from that fact, however, a reasonable interpretation is that the requirement of court approval is also prospective. Such an agreement is not effective for any purpose if made after the effective date of the statute without the approval of a court. The statute does not retroactively cancel agreements already in effect before its enactment because they had not received court approval at a time when none was required. As a remedial statute, section 130-c, subdivision 2, " should receive that interpretation which will best and most effectually carry out the intent of the Legislature, as indicated by its terms; and in construing it, so far. as there is any ambiguity in its frame-work, respect should be had to the law as it existed prior to its enactment, and the evils intended to be remedied. Such construction should be given as will redress the evils and advance the remedies which were in the minds of the legislators in the enactment of the law." (*Johnson* v. *Oppenheim*, 55 N. Y. 280, 289.)

Another question remains. Does the New York Legislature retain control over voting trusts of New York corporations even if such trusts were originally created under a plan of reorganization in a proceeding under the Federal Bankruptcy Act? To state the question is to answer it. No reorganization plan whether approved by State or Federal court can by reason of such approval confer corporate powers denied by statutes of the state in which the corporation was organized. Nor can such court by such approval prevent the state from exercising in the future the power of control which it has reserved to itself over corporations of its own creation.

Contentions to the contrary have been so well answered in two opinions by the Circuit Court of Appeals (2d Circuit), involving section 130-c, subdivision 2, that we quote from them.

In *Bakers Share Corporation* v. *London Terrace, Inc.* (130 F. 2d 157, 159), Judge LEARNED HAND wrote for the court:

" The ' Streit Law ' was no doubt primarily meant * * * to protect unguaranteed bondholders, not only before and during foreclosure, but at and after any reorganization which should follow under section 122; but there is no antecedent reason why the protection given to the shareholders of a new corporation organized in aid of such a reorganization should not be given to those of a similar corporation organized in aid of a reorganization under section 77-b. No limitations upon the powers of such a corporation would in any sense invade the functions of the bankruptcy court; that *court is not obliged to use a state corporation as its instrument at all;* it may leave the debtor in possession of its property; *but if it does choose to use one, it must take it with such powers as the state law sees fit to give it.*"

In the case of *Matter of Ambassador Hotel Corp.* (124 F. 2d 435, 436, 437), Judge SWAN wrote for the court: " Sharp concedes that the voting trust certificates were validly issued pursuant to the confirmed plan of reorganization, and the issue he tenders for decision by the state court is: What is the legal effect of a subsequently enacted state statute upon the rights created by the federal decree in holders of voting trust certificates. Obviously, this question had not been passed upon by the reorganization court. Nor was it one over which the court could reserve jurisdiction to itself. When the court confirmed a plan of reorganization

which set up a New York corporation with stock issued to voting trustees, *it used a tool created under and subject to state laws.* The future fate of the corporation was not within the control of the bankruptcy court, nor could that court reserve power to adjudicate controversies in which it might become involved — whether they should arise from a change in state law or from the corporation's own conduct, as for example, negligent injury to some guest of the hotel or failure to pay current bills. The appellants argue that a retroactive application of the statute under discussion will ' modify ' the plan of reorganization. We are not here concerned with how the statute is to be construed; but if the voting trust provisions shall be applied retroactively, it will be merely a consequence of having incorporated under the laws of New York the company which was to carry on the debtor's reorganized business. *In selecting such a corporation as an instrumentality of reorganization, the bankruptcy court sent it out into the state as fully subject to state law as though the court had had nothing to do with its creation."*

The judgment of Appellate Division should be reversed with costs, and the matter remitted to Special Term for proceedings not inconsistent with this opinion.

LOUGHRAN, RIPPEY and DESMOND, JJ., concur with LEHMAN, Ch. J.; CONWAY, J., dissents in opinion in which FINCH and LEWIS, JJ., concur.

Judgment affirmed.