Ruth Elizabeth McCormick **TANKERS-LEY** et al., Plaintiffs,

v.

Joseph M. P. **ALBRIGHT** et al., Defendants.

No. 73 C 883.

United States District Court, N. D. Illinois, E. D.

Feb. 5, 1974.

Don H. Reuben, Lawrence Gunnels and Leo K. Wykell, Kirkland & Ellis, Chicago, Ill., for plaintiffs.

Max E. Wildman, David L. Schiavone and Thomas H. Snyder, Wildman, Harrold, Allen & Dixon, Chicago, Ill., and Paul, Weiss, Rifkin, Wharton & Garrison, New York City, for defendants.

## MEMORANDUM OPINION

DECKER, District Judge.

This action was instituted by the Trustees of the McCormick-Patterson Trust ("Trust") for a declaratory judgment to affirm their rights, as Trustees, to vote the shares of stock of the Tribune Company ("Company"), held by the Trust, in favor of certain proposed amendments to the Company's certificate of incorporation and by-laws. The defendants are two beneficiaries of the

Trust who have challenged plaintiffs' right to vote for the proposals.[1] In a prior opinion, this court denied the beneficiaries' motion to dismiss the complaint for lack of personal jurisdiction, 374 F.Supp. 530. Defendants have now answered and submitted numerous counterclaims. Presently before the court are plaintiffs' motions for summary judgment on their complaint, and for dismissal of the counterclaims on the ground that they fail to state a claim upon which relief can be granted.

## I. FACTUAL BACKGROUND

### A. The McCormick-Patterson Trust

The Trust was established in Illinois in 1932, and will terminate on April 1, 1975. The Trust corpus consists of approximately 53% of the outstanding stock of the Tribune Company, a Delaware corporation.[2] This stock was originally owned by Joseph Medill, the Company President and publisher of the *Chicago Tribune* from 1874 to 1899. At his death in 1899, the stock was placed in a trust managed by three trustees—two Medill family members [3] and the Company's legal counsel. By the late 1920's control of that trust had devolved to Medill's two grandsons, Robert R. McCormick and Joseph Medill Patterson.

Both McCormick and Patterson had been directors of the Company since 1911, and co-publishers of the *Tribune* since 1914.

On May 5, 1932, prior to the expiration of the Medill trust, McCormick and Patterson entered into the trust agreement which is the subject of this litigation. The following day, all the beneficiaries of the Medill trust agreed to place their Company stock in the McCormick-Patterson Trust. Upon the expiration of the former trust instrument in 1933, approximately 53% of the Company's stock, originally owned by Joseph Medill, passed into the McCormick-Patterson Trust.

Under the express terms of the agreement, McCormick and Patterson were the first Trustees and their successors, as Trustees, were to be drawn from Company personnel.[4] Accordingly, virtually all of the Trustees have been directors or executives of the Tribune Company or its subsidiaries, or both. At present, the Company has fourteen directors and a five-member Executive Committee. Seven of the eight Trustees are directors of the Company and hold executive positions with the Company or its wholly-owned subsidiaries; [5] three of

1. The record indicates that the Trust has 151 beneficiaries.

2. The Company was originally incorporated in Illinois, but, in 1968, was reincorporated under the laws of Delaware.

3. One of the persons was Managing Editor of the *Tribune*.

4. Paragraph 9 of the Trust Agreement states in pertinent part:

" . . .

(c) Except as herein provided, each successor trustee to said Robert R. McCormick, in order to qualify and continue to act as Trustee hereunder, must:

. . .

(2) in so far as it is practicable, be selected from among the officers, directors and employees of the Tribune Company or the lineal descendants of Katherine Medill McCormick, or, if the selection from among that group is not feasible, then from among the officers, directors or employees of any corporation or organization owning and holding a majority of stock of the Tribune Company;

. . .

(d) With the exception of Eleanor Patterson, each of the successor trustees to Joseph Medill Patterson, in order to qualify and continue to act as Trustee hereunder, must:

. . .

(3) in so far as it is practicable, be selected from among the officers, directors and employees of the News Syndicate Co. Inc. or the lineal descendants of Elinor Medill Patterson, or from among the members of the law firm generally representing the News Syndicate Co. Inc."

The News Syndicate Company, Inc., is a wholly-owned subsidiary of the Tribune Company, formed in New York by Patterson in 1919; it publishes the *New York Daily News*.

5. Ruth Elizabeth McCormick Tankersley, who became a Trustee and regular feature columnist for the *Tribune* in 1955, resigned as a director on April 2, 1973.

the Trustees are members of the Executive Committee.[6]

### B. The Events Culminating in This Litigation

Plaintiffs allege that, as Trustees of the McCormick-Patterson Trust and as directors of the Tribune Company, they had long considered amending the Company's certificate of incorporation and by-laws. During this period, plaintiffs consulted with various experts in relevant fields with respect to appropriate changes. In late 1972, the Board of Directors unanimously recommended that the stockholders adopt the amendments now under challenge. Then, in March, 1973, a Notice of Annual Meeting of Stockholders, with a proxy statement and proxy was sent to each stockholder of the Company. These documents recited the proposed amendments, and explained their purpose and the effect their adoption would have upon control of the Company. On the same date, although not required under the Trust to do so, plaintiffs sent a letter to all beneficiaries of the Trust advising them of the proposed action and their intent to vote the Trust stock in favor of the amendments, and enclosed a copy of the amendments and proxy statement.[7] However, on March 30, 1973, defendants wrote the Trustees objecting to the amendments and requesting that the Trustees refrain from voting in favor of their adoption. In this correspondence, the beneficiaries claimed that the proposals would insure continuity of management, increase the Company's Delaware franchise tax, and jeopardize New York Stock Exchange listing, thus decreasing the value of the Company's stock and casting doubt upon the Trustees' conclusion that the proposals were in the best interests of the stockholders. Finally, defendants alleged that the Trustees were in a conflict of interest position and claimed that the appropriate course would be to withdraw the amendments and allow the "usual process of stockholder votes" to determine the advisability of corporate changes after the Trust's expiration.

The Trustees thereupon instituted this action and sent a letter to all Trust beneficiaries apprising them of the suit, enclosing a copy of defendants' letter, and requesting the beneficiaries' views on the amendments. This poll has revealed that beneficiaries owning 92.6% of the Trust corpus are in favor of the proposals and beneficial holders of only 3.4% of the stock are opposed.[8]

## II. THE AMENDMENTS UNDER CHALLENGE

The proposals would amend the Company's certificate of incorporation and by-laws as follows:

(1) The Board of Directors would be divided into three classes, to serve staggered three-year terms, with the term of one class expiring each year.[9] At the 1974 annual stockholders meeting, one class (four directors) would be elected for a one-year term, another (five directors) for two years, and the third (five directors) for three years; thereafter, one class would be elected each year for a three-year term.

(2) The Company would be prohibited from entering into any business combination with any party which directly or indirectly owned more than 10% of any class of stock of the Company unless it

---

6. This factual background makes clear that the majority block of the Company's stock, now in the Trust, has always been controlled by persons actively engaged in the management of the corporation.

7. The proposals were to be voted upon at the April 12, 1973, annual meeting. Because of this litigation, however, the amendments have never been placed before a stockholders' meeting.

8. The Trustees also claim that holders of 91.8% of the shares outside the Trust are in favor of the amendments. Overall, therefore, 92.2% of the Company's shares are in favor of the proposals.

9. The fourteen-member Board of Directors presently is elected annually.

received the approval of 80% of the voting securities holders.

(3) The number of authorized shares of common stock would be increased from 8,000 to 20,000,000 and classified as Series A Common Stock with full voting rights, and the Board of Directors would be empowered to determine the dividend rights of any new shares issued.[10]

## III. THE DECLARATORY JUDGMENT ACTION

Plaintiffs have moved for summary judgment as to their entitlement to vote all shares of the Tribune Company stock held in the Trust in favor of the proposed amendments. In opposing the motion, defendants repeat the charges made in their letter and characterize this as a case of conflict of interest and of self-dealing "by fiduciaries, who serve as trustees and as corporate directors and officers;" they allege that the adoption of the amendments would benefit the plaintiffs individually and would operate to the detriment of the beneficiaries and other Company stockholders.

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure may be granted only where the record demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See, e. g., Kirk v. Home Indem. Co., 431 F.2d 554, 559 (7th Cir. 1970); Progress Dev. Corp. v. Mitchell, 286 F.2d 222, 234 (7th Cir. 1961). Caution must be exercised in granting summary judgment; the underlying facts are to be viewed in the light most favorable to the party opposing the motion. Adickes v. Kress & Co., 398 U.S. 144, 158–159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Technograph Printed Circuits, Ltd. v. Methode Electronics, Inc., 356 F.2d 442, 446–447 (7th Cir.), cert. denied, 384 U.S. 950, 86 S.Ct.

1570, 16 L.Ed.2d 547 (1966); American Securit Co. v. Hamilton Glass Co., Inc., 254 F.2d 889, 892–893 (7th Cir. 1958). Nonetheless,

> "[w]ith the ever increasing burden upon the judiciary, persuasive reasons exist for the utilization of summary judgment procedure wherever appropriate. Therefore, while . . . courts should not look the other way to ignore the existence of genuine issues of material fact, . . . we do not deem it necessary in the best interest of judicial administration to strain to find the existence of such genuine issues where none exist. To do so would perforce have a dampening effect on the proper use of a salutary procedural device . . . ."

Kirk v. Home Indemn. Co., supra 431 F.2d at 560.

### A. Legality of the Proposed Amendments

There can be no doubt as to the validity of the proposed amendments under Delaware law as such provisions are expressly authorized by the corporation laws of that state, see 8 Del.C. § 151(a) and § 242(a)(3) (increase of authorized stock, reclassification, and authorization of directors to issue additional series of stock), id. § 216 (80% shareholder voting requirement for certain business combinations), id. § 141(d) (classification and staggered election of directors), and have been adopted by a number of large corporations. See, e. g., Elgin Nat'l Industries, Inc. v. Chemetron Corp., 299 F.Supp. 367 (D.Del.1969); McDonough v. Copeland Refrig. Corp., 277 F.Supp. 6 (E.D.Mich.1967); Stockholders Comm. for Better Mgmt. v. Erie Tech. Prods., 248 F.Supp. 380 (W.D.Pa. 1965); Mullaney, Guarding Against Takeovers—Defensive Charter Provisions, 25 Bus.Law. 1441 (1970). Indeed, defendants do not question the proposals on this basis.

---

10. A number of the amendments have not been challenged specifically in this litigation, e. g., indemnification of officers and directors pursuant to Delaware law, granting of pre-emptive rights to shareholders to purchase Company stock, and authorization to the Board of Directors to fill vacancies on the Board by majority vote after April 1, 1975.

## B. The Duty Owed to the Beneficiaries

The primary issue is whether plaintiffs have breached the trust imposed upon them as voting trustees. The standards to which a fiduciary is held have been so frequently articulated as to hardly bear repeating here. Unquestionably, trustees are "obligated to act with the highest degree of fidelity and with utmost good faith toward the beneficiaries." Wallace v. Malooly, 4 Ill.2d 86, 94, 122 N.E.2d 275, 279 (1954). See White v. MacQueen, 360 Ill. 236, 248, 195 N.E. 832 (1935); Morris v. The Broadview, Inc., 328 Ill.App. 267, 274, 65 N.E.2d 605 (1st Dist. 1946); In re Estate of Sanders, 304 Ill.App. 57, 68–69, 25 N.E.2d 923 (2d Dist. 1940).

■ Defendants' conflict of interest allegation arises from the plaintiffs' dual roles as Trustees under the Trust and as executives responsible for the direction and management of the Company. Since the nature of the fiduciary relation requires the trustee to act only for the benefit of the *cestuis que trustent*, see, e. g., In re Flagg's Estate, 365 Pa. 82, 73 A.2d 411 (1950), conflicts of interest generally are prohibited. See, e. g., Humpa v. Hedstrom, 341 Ill.App. 605, 614, 94 N.E.2d 614 (1st Dist. 1950); Olson v. Rossetter, 330 Ill.App. 304, 316, 71 N.E.2d 556 (1st Dist. 1947). However, this proscription is subject to modification by the settlor; the mere existence of a conflict does not *ipso facto* require a prohibition of the trustees' planned action where the trust instrument creates the conflict. The McCormick-Patterson Trust clearly evidences the settlors' intent that there be identity between Trustees and Company personnel, and the history of the Trust discloses that this objective has been realized. It is well-settled that courts will carry out the settlor's intent unless to do so would breach a "rule of law, or good morals, or the [declared] public policy of the State." United States Trust Co. v. Jones, 414 Ill. 265, 270, 111 N.E.2d 144, 147 (1953). The comment of the court in Conant v. Lansden, 341 Ill. App. 488, 94 N.E.2d 594 (4th Dist. 1950), aff'd in part, reversed in part on other grounds, 409 Ill. 149, 98 N.E.2d 773 (1951), indicates Illinois policy in this context:

> "It is a common situation, for a testator who owns what he deems a good business, to include it in a trust and to appoint as one of the trustees, an officer or employee who is familiar with the business. His reasons are too patent to require comment. [The testator] chose among his trustees, two men who had been officers of the company since it was originally incorporated. It would be a strange rule of law to hold that the trustees were guilty of bad faith, self-dealing, or other improper conduct if they failed to resign their corporate positions, and thus discontinue the very reason for their selection." 341 Ill.App. at 502, 94 N.E.2d at 601.

■ Nor will "[c]ourts of equity . . . interfere with the exercise of discretionary powers of a trustee in the absence of proof of fraud, bad faith, or abuse of discretion . . . ." Continental Nat'l Bk. v. Sever, 393 Ill. 81, 93, 65 N.E.2d 385, 391 (1946). See Nelson v. Folegstrom, 5 Ill.App.3d 804, 806, 284 N.E.2d 339 (3d Dist. 1972); In re Moir Hotel Co., 186 F.2d 377, 381 (7th Cir. 1950); In re Flagg's Estate, *supra* 73 A.2d at 415; Altschuler v. Chicago City Bk. & Trust Co., 380 Ill. 137, 142, 43 N.E.2d 673 (1942); Morris v. The Broadview, Inc., *supra* 328 Ill.App. at 272–273, 65 N.E.2d 605.

Thus, the Trustees' proposed action should be upheld unless it constitutes fraud, bad faith, dishonesty, or an abuse of discretion. In re Flagg's Estate, *supra* 73 A.2d at 415; In re Kellogg's Trust, 35 Misc.2d 541, 230 N.Y.S.2d 836 (Sup.Ct.1962); In re Dow's Will, 156 N.Y.S.2d 804 (Sur.1955), modified on other grounds, 3 A.D.2d 968, 162 N.Y.S. 2d 196 (1957), aff'd, 5 N.Y.2d 739, 177 N.Y.S.2d 718, 152 N.E.2d 673 (1958); In re Farrell's Will, 91 N.Y.S.2d 89 (Sur.1949); In re Pincus' Estate, 378 Pa. 102, 105 A.2d 82 (1954); Bogert,

Trusts & Trustees § 543(U), at 583–585 (2d ed. 1960).[11]

■ A vote in favor of the proposed amendments is clearly within the Trustees' discretion under the Trust. That instrument expressly confers on the Trustees "full power and authority" to vote the stock of the Company held by the Trust, and, with the exception of certain transactions not involved here, the Trustees need not obtain the consent of the beneficiaries to their action.[12]

Further, beyond the authorized conflict of interest, the record is void of any indication of fraud, bad faith, dishonesty, or abuse of discretion on the part of the Trustees. Indeed, defendants nowhere specifically charge plaintiffs with such misconduct,[13] but appear to claim that the Trustees have not met the burden of showing the propriety of their proposed vote. Such a contention is without merit.

Prior to adopting the proposed amendments, the Board of Directors received advice from two prominent investment banking firms—Goldman, Sachs & Company and Salmon Brothers—with respect to the steps to be taken by the Company prior to public trading of Tribune Company stock. Both of these consultants specifically advised that the interests of the Company, and of the holders of beneficial and legal interests in its stock, would be best served by adoption of the amendments.[14]

The proxy material sent to the beneficiaries and other shareholders was entirely candid in describing the amendments, the motivation which prompted their adoption by the Board, and their likely effects on management control. According to the Proxy Statement, the purposes of the amendments are "[t]o strengthen provisions for continuity of management" and "to give the company greater means and more flexibility to respond to financial needs and to capitalize on opportunities for profitable investment in the future." [15]  Of particu-

11. As expressed by the court in In re Flagg's Estate, *supra* 73 A.2d at 415, "the test in such cases is not in the quantum of possibly conflicting interest, but in the administration which is always subject to the scrutiny of the . . . court."

12. In the past, Trustees have exercised their voting power on such significant matters as the institution of a stock option plan (1957 and 1970), amendments to the certificates of incorporation and reincorporation. Beneficiary approval was required, and obtained, only with respect 'to the reorganization, although Trustees polled the beneficiaries for their views on the stock option plans. There is no indication that any of these actions was challenged.

13. Counterclaims One and Two, in which defendants charge the Trustees with "abus[ing] their fiduciary obligations," by engaging in certain conduct, come closest to making these allegations. However, as discussed in Section IV A., *infra*, those assertions fail to state a claim. As defendants themselves state, their contention as to the impropriety of the plaintiffs' proposed action is based upon the benefit to be received by the plaintiffs personally to the detriment of the other Trust beneficiaries and Company shareholders.

14. Defendants challenge the "sketchy" and "conclusory" nature of the affidavits submitted by partners of those firms and have filed the affidavit of an officer of Duff, Anderson & Clark, Inc., an investment and financial analysis firm, wherein it is claimed that the staggered term and high vote amendments might eliminate any premium which a purchaser would pay for Company securities which carry with them control of the issuer. To support this prediction, the affiant has attached a list of companies that have recently been targets of tender offers; in each instance, the outsider paid a substantial premium above the market price to gain control. In response, plaintiffs have presented a list of companies the selling shareholders of which received premiums in stock tender transactions; within approximately one year the target companies' stock had declined in value 18% to 40%. These exhibits do not create a material factual issue. At most, defendants' argument indicates a difference of business judgment as to the possibilities that the market value of Company stock may decline and that control premiums may be more difficult to obtain when the amendments take effect.

15. Moreover, the Proxy Statement emphasized the significance of the Trust's termination and the advantage the amendments might grant incumbent management in the declaration that the effective date of certain of the proposals was "keyed to the expiration of the McCormick-Patterson Trust on April 1, 1975. However, approval of these proposals will not bring about any change in the control and management of your Company. In fact, in

lar note are the statements concerning the high vote requirement for certain business combinations and the provision establishing staggered terms for directors. The former was readily acknowledged as a provision to discourage attempts "to take over the Company after the expiration of the McCormick-Patterson Trust," while the directors admitted that institution of the latter proposal

"would have the effect of requiring at least two shareholder meetings . . . instead of one, at present, to effect a change in majority control of the Board. The Board believes that the proposed amendment will insure continuity of management experience which is desirable and in the best interests of the Company and its stockholders generally."

Thus, although plaintiffs advocated approval of the amendments, they did make full disclosure. See Russ v. Blair, 330 Ill.App. 571, 577, 71 N.E.2d 838 (1st Dist. 1947). In spite of these disclosures and the beneficiaries' receipt of the defendants' objections, the proposals have gained overwhelming approval of Company shareholders. Moreover, as previously mentioned, the provisions are completely lawful under applicable statutes, and have been adopted by a number of corporations.

Defendants assert that the proposed amendments would benefit plaintiffs individually by "perpetuating" their control over the Company. Admittedly, but in complete conformity with the Trust, plaintiffs would control the 1974 annual election of directors. Assuming that the plaintiffs would seek to secure maximum tenure as directors at that election under the amendments,[16] five Trustees would obtain three-year terms and three

would secure two-year terms. But, in April, 1975, after the Trust's expiration, and in 1976, the stockholders will elect four and five directors, respectively. Thus, within approximately one year after the termination of the Trust, the shareholders will have had the opportunity to elect a majority of the directors.[17]

Defendants' more substantial argument is that adoption of the amendments, particularly the staggered term provision, would enable plaintiffs to remain in control of the Company long after the expiration of the Trust, in violation of the purported Illinois rule prohibiting the extension of trustees' control over trust property beyond the period specified in the trust instrument. However, the cases cited by defendants are so significantly distinguishable that they cannot be deemed to control this case. Primary reliance is placed upon Friedberg v. Schultz, 312 Ill.App. 171, 38 N.E.2d 182 (1st Dist. 1941), a case arising out of a federal bankruptcy proceeding. The voting trust agreement there provided for termination on November 18, 1941, unless extended by unanimous vote of the trustees 30 days prior thereto, and specified the dates on which annual meetings were to be held. At a regularly scheduled meeting in 1939, the trustees amended the corporate by-laws so that future annual meetings would be held each October, beginning in 1940. The voting trustees, who had also been elected directors and officers, did not agree to extend the life of the trust. Accordingly, beneficiaries sued to enjoin the trustees from electing anyone, including themselves, as directors or officers of the corporation for any period beyond November 18, 1941.[18] In

---

the opinion of your Board, approval of the proposals will lessen the possibility of such change."

16. This assumes that Ruth Elizabeth McCormick Tankersley, who has resigned as a director, see note 5 *supra*, or her replacement, if any, would seek a directorship.

17. Four directors would be elected to three-year terms in 1975 and five would be elect-

ed to the same term in 1976. As previously noted, the proxy material clearly stated that a classified board would require two stockholder meetings to ·effect a change in Board control.

18. By electing themselves directors and officers in October, 1941, the trustees would have retained corporate control beyond the expiration of the trust in November of that year.

the course of its opinion granting relief, the court reasoned:

"The voting trust agreement expressly provides it shall terminate on the 18th of November, 1941, and that the trustees shall within thirty days after that date turn over the property to the persons entitled thereto. The three trustees who are officers and directors of the hotel are expressly required by the terms of the voting trust agreement to turn over the property to the persons entitled thereto. This would not be accomplished within the meaning of the trust agreement were the directors and officers of the hotel authorized to control the property for a period of about eleven months after it was delivered to the true owners." *Id.* at 175, 38 N.E.2d at 183.

Even assuming that control of the Company constitutes control of the Trust property, the voting trust in *Friedberg* was created as part of a bankruptcy reorganization plan, and the trustees in that case defended their action solely on the basis of a statutory provision not involved in this litigation. In addition, an inference easily can be drawn that the trustees were manipulating the meeting dates to prolong their control in the event an agreement to extend the trust was not reached.

The court has studied the other authorities upon which defendants rely, Brown v. McLanahan, 148 F.2d 703 (4th Cir. 1945); Olson v. Rossetter, *supra*; Morris v. The Broadview, Inc., *supra*, and has concluded that they also do not require denial of the relief requested by the Trustees.

In summary, the record establishes that the proposed amendments are valid under Delaware law, are by no means new or unusual corporate provisions, and have been overwhelmingly approved by Company shareholders, who had been fully apprised of their nature and effect. Further, adoption of these amendments will not perpetuate the Trustees as controlling directors, and, to the extent that a conflict of interest is present, it does not preclude the Trustees from voting for the amendments, as the settlors purposely created this conflict and the plaintiffs have acted in good faith in recommending the corporate changes.

It is clear that if only the foregoing facts and allegations were present, plaintiffs would be entitled to summary judgment. However, in light of the issues raised in counterclaims Four, Five and Six, as to the number of shareholders of record of Company stock, entry of such an order at this time would be inappropriate. See Section IV C., *infra*.

## IV. DEFENDANTS' COUNTERCLAIMS

### A. Counterclaims One and Two: Mismanagement and Breach of Fiduciary Duty

The First and Second Counterclaims essentially recite the same "conflict of interest" and "self-dealing" charges already disposed of in Section III, and need not be discussed further. The counterclaims also allege violations of the Securities and Exchange Act of 1934, 15 U.S.C. § 78a et seq., identical to those contained in Counterclaims Four, Five and Six, to be discussed *infra*.

Counterclaimants also have charged plaintiffs with causing the Company to sell units of beneficial interest in the Trust to themselves at prices below fair market value and with operating unprofitable businesses while receiving compensation therefrom. These vague and conclusory allegations are insufficient to require an answer. Although the Federal Rules of Civil Procedure were intended to liberalize pleading requirements, charges of mismanagement and breach of fiduciary duty should be supported with more particular factual statements.[19] See F.R.Civ.P. 8(b).

Accordingly, these counterclaims will be dismissed.

---

19. Defendants also allege that the outstanding shares of Company stock are virtually unmarketable because of plaintiffs' failure to split the stock or to issue substantial dividends.

### B. Counterclaim Three: Voting Trust

■ This counterclaim alleges that the McCormick-Patterson agreement constitutes a "voting trust," and is invalid for violations of the Illinois and Delaware voting trust statutes. See Ill. Rev.Stat. ch. 32, § 157.30a; 8 Dela. § 218. The courts generally recognize three criteria for a voting trust: (1) The voting rights of the stock must be separate from other attributes of ownership; (2) the voting rights must be intended to be irrevocable for a definite period of time; and (3) the principal purpose of the grant of voting rights must be to acquire voting control of the corporation. See Lehrman v. Cohen, 43 Del.Ch. 222, 222 A.2d 800 (Sup.Ct. 1966); Abercrombie v. Davies, 36 Del. Ch. 371, 130 A.2d 338 (Sup.Ct.1957); Gumbiner v. Alden Inn, Inc., 389 Ill. 273, 59 N.E.2d 648 (1945); Boyle v. John M. Smyth Co., 248 Ill.App. 57 (1st Dist. 1928); 5 Fletcher, Cyclopedia of the Law of Private Corporations § 2075, at 367–68 (Perm.ed.1967); Bogert, Trusts & Trustees § 251 (2d ed. 1964). As described by the Delaware court, a voting trust is

> "a device whereby two or more persons owning stock with voting powers, divorce the voting rights thereof from the ownership, retaining to all intents and purposes the latter in themselves and transferring the former to trustess in whom the voting rights of all the depositors in the trust are pooled.
>
> . . . . . .
>
> ". . . whether a particular agreement constitutes a voting trust, and, therefore, what its real purpose and intent is must ordinarily be ascertained from the provisions of that instrument, when read as a whole, and the rights and powers given thereby."

Aldridge v. Franco Wyoming Oil Co., 24 Del.Ch. 126, 7 A.2d 753, 764–765 (1939).

■ Careful examination of the Trust provisions has persuaded the court that the McCormick-Patterson agreement is a voting trust. As to the first element, the trust instrument recites that the beneficiaries would convey to the Trustees the entire title to the trust property and would retain "no title or interest, legal or equitable, in or to the property as such but only their respective interests in the income, proceeds and avails of the trust property." However, succeeding provisions negate that broad statement. The beneficiaries reserved the right to dispose of their respective interests or any part thereof in any manner, by any means, and for any purpose, with the caveat that the transfer would not be deemed binding upon the Trustees until an appropriate copy of the transfer instrument had been accepted by the Trustees. In contrast, substantial restrictions have been placed upon the Trustees' freedom of action in dealing with the Trust corpus. For example, the Trustees may not in any way dispose of the Trust property without approval of the beneficiaries. Nor may they take any action with regard to a reorganization, consolidation, or merger without the consent of the holders of 51% of the beneficial interests of the Trust.

The duties imposed upon the Trustees, on the other hand, closely resemble the ordinary management obligations generally placed upon trustees. Thus, the Trustees are required (1) to pay the beneficiaries, at least quarterly, the net income to which they are entitled, (2) to keep books and records pertaining to Trust administration and to allow the beneficiaries to inspect such records, (3) to apportion expenses between income and principal, and (4) to pay taxes, assessments, costs of Trust administration,

---

This complaint, which, in effect, seeks the issuance of additional shares, conflicts with their position in the declaratory judgment action where they opposed the increase in authorized shares. In light of the disposition of the issues in Section III, the matter need not be addressed here.

and all other fees and expenses necessary to preserve and maintain the Trust property. In addition to their authority to vote the stock and to transfer the shares of stock necessary to qualify as directors those persons whom they desire to elect as directors, the Trustees are empowered to advance money to the Trust for Trust purposes and to repay themselves out of income, to acquire Company common stock, to become beneficiaries, and to hire agents. Thus, it is clear that the Trustees' authority over Trust principal is limited to voting the stock.

■ None of the authorities previously cited in this section indicate that the broad grant of powers beyond that merely to vote the stock disqualifies the arrangement as a voting trust. See Fletcher, Cyclopedia of the Law of Private Corporations, *supra;* Bogert, Trusts & Trustees, *supra.* Once the essential division of voting and other stock rights has been achieved, the imposition of additional, consistent obligations should not negate the voting trust characteristics of the agreement. The duties of a voting trustee depend upon the terms of the trust instrument, and, with exceptions not relevant here, the parties are free to adopt any provisions they choose. Chandler v. Bellanca Aircraft Corp., 19 Del.Ch. 57, 162 A. 63 (1932); Winitz v. Kline, 288 A.2d 456 (Del.Ch. 1971); Morris v. The Broadview, Inc., *supra;* Gumbiner v. Alden Inn, Inc., *supra;* Kann v. Rosett, 307 Ill.App. 153, 30 N.E.2d 204 (1st Dist. 1940). Moreover, provisions similar to those in the McCormick-Patterson Trust have been found in voting trusts. See Venner v. Chicago City Ry. Co., 258 Ill. 523, 101 N.E. 949 (1913); Morris v. The Broadview, Inc., *supra;* Bogert, Trusts & Trustees § 1192 (2d ed. 1969).

■ The second criterion is also met. The Trust agreement provides that, un-

less sooner terminated, the Trust is to end upon the expiration of 20 years after the date of the death of the survivor of Robert R. McCormick or Joseph Medill Patterson, or upon the Trustees' disposal of all of their interest in the Tribune Company, its subsidiaries, or related companies. Earlier termination could be achieved upon written consent of beneficiaries holding 87.75% of the total beneficial interest. Termination clauses of this sort are recommended, see, Bogert, Trusts & Trustees, *supra,* and have not disqualified agreements as voting trusts in the past. See Morris v. The Broadview, Inc., *supra.*

Thirdly, a consideration of the circumstances surrounding the creation of the Trust and the provisions of the agreement as a whole compels the conclusion that the principal purpose of the grant of voting rights was to acquire or maintain voting control. Plaintiffs appear to have unwittingly conceded as much.[20]

■ Notwithstanding the conclusion that the agreement created a voting trust, the instrument is not invalidated by either the Illinois or Delaware statutes. The Illinois law concerning voting trusts was not enacted until 1947, fifteen years after the execution of the trust agreement. Thus, in order to reach this Trust, the statute would have to be applied retroactively. However, "[r]etroactive legislation is not favored, and as a general rule statutes are construed to operate prospectively unless the legislative intent that they be given retroactive operation clearly appears from the express language of the acts, or by necessary or unavoidable implication." People ex rel. Baylor v. Bell Mut. Cas. Co., 54 Ill.2d 433, 440, 298 N.E.2d 167, 171 (1973), *quoting* United States Steel Credit Union v. Knight, 32 Ill.2d 138, 142, 204 N.E.2d 4 (1965). See People ex rel. Mereness v. Board of Educa-

20. In their "Reply to Defendants' Memorandum in Opposition to Motion to Dismiss Counterclaims," plaintiffs declare: "It was clearly established when the Trust was created that shareholders in Illinois may lawfully utilize a trust instrument *for the purpose of controlling a corporation, including the voting of shares as a unit.* [Citing cases.]" (Emphasis added.)

tion, 349 Ill. 291, 298–299, 182 N.E. 383 (1932); Miner v. Stafford, 326 Ill. 204, 207, 157 N.E. 164 (1927); Wolf v. Roosevelt, 290 N.Y. 400, 49 N.E.2d 502 (1943); Mackin v. Nicollet Hotel, 25 F. 2d 783, 786 (8th Cir.) cert. denied, 278 U.S. 618, 49 S.Ct. 22, 73 L.Ed. 541 (1928); Western Pac. R. Corp. v. Baldwin, 89 F.2d 269, 273 (8th Cir. 1937).[21] No such intent appears on the face of the statute. Nor should such retroactive intent be lightly inferred, especially where, as here, such an inference would modify or negate existing rights and obligations. See Wolf v. Roosevelt, *supra* 290 N.Y. at 402, 49 N.E.2d 502; Western Pac. R. Corp. v. Baldwin, *supra*.

In a closely analogous situation, the U. S. Court of Appeals for the Eighth Circuit declared that the Delaware statute, which limits the life of any voting trust to ten years, did not apply to a 10-year voting trust executed approximately one year before the law's enactment and subsequently extended for a second 10-year period. The court's reasoning is particularly applicable here:

> "The right granted by the voting trust agreement to extend its time beyond December 31, 1934, came into existence prior to the enactment of the amendatory act. The voting trust at the time it was created was apparently lawful. Mackin v. Nicollet Hotel [25 F.2d 783 (8th Cir. 1928)]. No contention that it was unlawful is made. Since the act of Delaware expressed no intent that it should be given a retroactive effect or deprive parties to an existing voting trust agreement of rights acquired thereunder, and since our attention is called to no decision of the highest court of Delaware construing it as affecting

existing voting trusts, we think the rule of construction referred to above should be applied." *Id.* 89 F.2d at 273–274.[22]

But even the defendants do not seriously argue that the enactment of the law required the immediate dissolution of the Trust. Rather, defendants contend that the statute limited the Trust's life to ten years from the effective date of the law. Under such a construction, the Trust agreement has been in violation of Illinois law since 1957. This contention has been properly rejected in the context of the New York voting trust statute, Wolf v. Roosevelt, *supra*, and will likewise be rejected here. In language equally applicable to this litigation, the court in Wolf noted: "The language of the statute is at least inept if the Legislature intended that it should retroactively restrict the power of stockholders to enter into voting trust agreements." Wolf v. Roosevelt, *supra* 290 N.Y. at 403, 49 N.E.2d at 503. See also Weil v. Beresth, 154 Conn. 12, 220 A.2d 456 (1966).

The foregoing, see Western Pac. R. Corp. v. Baldwin, *supra*, also substantially disposes of defendants' argument that, upon the Company's reincorporation in Delaware in 1968, the Trust became subject to that state's voting trust statute and is now invalid. In support of this conclusion, defendants cite Ringling v. Ringling Bros.-Barnum & Bailey Combined Shows, 29 Del.Ch. 318, 49 A.2d 603 (1946), modified, 29 Del.Ch. 610, 53 A.2d 441 (1947). The voting agreement in question there had been executed in Illinois, involved a Delaware corporation, and was to be performed in New York. The court followed what it considered to be the settled rule that "in

---

21. As stated by the court in Western Pac. R. Corp. v. Baldwin, supra at 273: "[A] general rule of statutory construction followed by the federal courts is 'that a retrospective operation will not be given to a statute which interferes with antecedent rights, or by which human action is regulated, unless such be "the unequivocal and inflexible import of the terms, and the manifest intention of the legislature." [citing cases].' "

22. Oppenheimer v. Cassidy, 345 Ill.App. 212, 102 N.E.2d 678 (1951), cited by both parties, decided, so far as relevant here, that an agreement, among the holders of a majority of the stock issued under a voting trust, to extend the trust for an additional ten years created a voting trust for a period not to exceed ten years and, thus, did not violate the statute.

such a situation the validity of an agreement affecting such voting rights is tested by the law of the state of incorporation, in this case Delaware." *Id.* 49 A.2d at 607.

■ However, under the recently developed "most significant relationship" test of conflict of laws, see generally Restatement (Second) Conflict of Laws (1971), the law of some other state may be applied in preference to the law of the state of incorporation if the former has a more significant relationship to the issues under consideration. See *id.* § 305.

■ Clearly, Illinois has more substantial contacts with the instant controversy than Delaware, or any other state. The Trust was created and has been administered in Illinois; the Company has continuously maintained its headquarters and principal place of business in that state; all of the Trust assets are in Illinois; and Illinois law has governed the substantive issues. See Memorandum Opinion, 73 C 883, 374 F.Supp. 530 (N.D.Ill., filed July 11, 1973). Under these circumstances, Illinois law should be preferred to that of Delaware. Thus, the 1968 reincorporation did not render the Trust subject to Delaware's voting trust statute.[23]

Accordingly, the Third Counterclaim will be dismissed.

### C. Counterclaims Four, Five and Six: Securities Exchange Act

In these counterclaims, defendants allege that the Trustees have violated the Securities Exchange Act of 1934, 15 U. S.C. § 78a et seq., by failing to cause the Company to register its common stock or to file proxy material with the Securities and Exchange Commission, and by failing to disclose material information. That Act applies only to companies with, *inter alia,* a class of equity security held of record by 500 or more persons. In view of the affidavits filed by the plaintiffs in support of dismissal of these counterclaims, their motion will be considered as a motion for summary judgment as to the securities matters. Although the court believes that the affidavits go a long way toward establishing that the number of holders of record has never been 500 or more, ruling on this motion will be deferred until February 22, 1974, at 10:00 o'clock A.M., to permit the defendants to file counter-affidavits or other evidence to demonstrate the existence of a genuine issue of material fact as to the number of shareholders of record.

### D. Counterclaim Seven: Accounting

In this counterclaim, defendants seek an accounting of all plaintiffs' activities as Trustees and for all the affairs of the Company from the date of the creation of the Trust to the date of termination. To support this broad request, defendants merely note that the Trust has been in existence for more than 40 years, and allege, on "information and belief", that plaintiffs have never accounted for any of their activities as Trustees or for any of the affairs of the Company.

■ A beneficiary's right to an accounting is not absolute, but is accorded only upon equitable principles; this relief should not be ordered "if the circumstances are such as to make an accounting unnecessary or improper." Nieberding v. Phoenix Mfg. Co., 31 Ill. App.2d 350, 356, 176 N.E.2d 385, 388 (2d Dist. 1961). See Patterson v. Northern Trust Co., 170 Ill.App. 501, 516 (1st Dist. 1912). No breach of duty, such as mismanagement, waste, dissipation of assets, or other misconduct on the part of the Trustees has been alleged in this counterclaim. It does not appear that the defendants have ever demanded an accounting or

---

**23.** Even assuming that Delaware law applies, the court's decision in *Baldwin* indicates that this Trust is beyond the purview of that state's voting trust statute.

that such a request would be futile. Indeed, the Trustees are under an affirmative obligation to "keep adequate books and records . . . reflecting income and disbursements and all other transactions which may occur in the administration of the trust estate" and to allow the beneficiaries to inspect these documents. Further, these two beneficiaries have received their dividend payments without protest or objection. Thus, defendants appear to be seeking relief here solely upon the ground that they are beneficiaries who have never received an accounting.

The court has been unable to find, and counsel have not cited, any case in which an accounting has been ordered upon such sparse allegations. In those situations in which an accounting has been granted, and even in some in which such relief has been denied, the courts have been presented with *some* allegations of impropriety on the part of the trustees. See, *e. g.,* Patterson v. Northern Trust Co., *supra*; Nieberding v. Phoenix Mfg. Co., *supra*; Davidson v. Blaustein, 247 F.Supp. 225 (D.Md.1965); American Sanitary Rag Co. v. Dry, 346 Ill.App. 459, 105 N.E.2d 133 (1st Dist. 1952); Belcher v. Birmingham Trust Nat'l. Bk., 348 F.Supp. 61 (N.D.Ala.1968); Byrne v. Tennes, 69 Ill.App.2d 231, 216 N.E.2d 256 (1st Dist. 1966); Regas v. Danigeles, 54 Ill.App.2d 271, 203 N.E.2d 730 (1st Dist. 1964).

Thus, I have concluded that the allegations in this counterclaim present no grounds upon which an accounting could be ordered.

In accordance with the views above expressed, an order has been entered on this date as follows:

(1) Ruling on plaintiffs' motions for summary judgment and to dismiss counterclaims 4, 5 and 6 continued to Friday, February 22, 1974, at 10:00 o'clock A.M.

(2) Plaintiffs' motion to dismiss all other counterclaims granted, and said counterclaims are hereby dismissed.