**Ruth Elizabeth McCormick TANKERSLEY et al., Plaintiffs-Appellees,**

v.

**Joseph M. P. ALBRIGHT and Josephine P. Albright, Defendants-Appellants.**

No. 74–1190.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 14, 1974.

Decided March 20, 1975.

As Modified on Denial of Rehearing April 11, 1975.

958

David L. Schiavone, Chicago, Ill., Bernard H. Greene, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants-appellants.

Don H. Reuben, Chicago, Ill., for plaintiffs-appellees.

Before FAIRCHILD, Chief Judge, HASTINGS, Senior Circuit Judge and SWYGERT, Circuit Judge.

SWYGERT, Circuit Judge.

The subject of this appeal is a voting trust originally created under Illinois law and having significant contacts with the State of Delaware. The questions include whether the trust still legally exists, whether the trustees, by taking certain proposed actions, have violated their fiduciary responsibilities, and whether there was compliance with certain registration requirements of the Securities Exchange Act of 1934.

Plaintiffs are trustees of the McCormick-Patterson Trust, a voting trust which has as its corpus fifty-three percent of the outstanding common stock of the Tribune Company. All Tribune Company stock is voting stock; the trust corpus therefore represents majority control of the company. Plaintiffs seek declaratory relief against defendants, who are beneficiaries of the trust as well as holders of non-trust interests in company stock. Numerous other beneficiaries under the trust have not been joined in this suit. Plaintiffs seek a declaration that they are legally empowered to vote all Tribune Company shares owned by the trust, that they are similarly empowered to vote these shares in favor of certain specific proposals to amend the company's certificate of incorporation and bylaws, that they have no conflict of interest either as trustees of the trust or as directors of the company in voting for these proposals, and finally that the defendants "have no legal right to interfere with, threaten, hinder, impede, or harass" the plaintiffs in the exercise of their judgment as trustees in connection with these matters. Defendants counterclaim for a declaration that the adoption of the proposed amendments by the trustees would be an act of self-dealing in breach of fiduciary trust obligations, that the trust is a voting trust which exists in violation of the laws of Illinois and Delaware, and that plaintiffs and the company are in violation of the Securities Exchange Act of 1934 and regulations thereunder. Defendants further seek to enjoin plaintiffs from approving the amendments, to terminate the trust and have a full accounting thereon, or in the alternative to have the plaintiffs removed as trustees, also with a full accounting. The district court granted summary judgment for plain-

tiffs on their complaint and dismissed or ruled against all of the defendants' counterclaims under Fed.R.Civ.P. 12(b) and 56.

## I

The McCormick-Patterson Trust was created in Illinois in 1932. As we indicated, its corpus is a majority of Tribune Company stock. This stock was originally owned by Joseph Medill, president of the company and publisher of the Chicago Tribune from 1874 to 1899. Upon Medill's death in 1899 the stock was placed in a trust called the Medill Trust, the control of which ultimately devolved to Medill's two grandsons, Robert R. McCormick and Joseph Medill Patterson, in the late 1920's. These two had been directors of the Tribune Company since 1911 and co-publishers of the Chicago Tribune since 1914. The Medill Trust was to expire in 1933. On May 5, 1932 McCormick and Patterson established the trust now in issue. On the following day, all the beneficiaries of the original Medill Trust agreed to deposit their Tribune Company stock in the McCormick-Patterson Trust upon the termination of the Medill Trust in 1933.

The first trustees of the McCormick-Patterson Trust were McCormick and Patterson, who were then managing the company. By the terms of the trust, their successor trustees were to be selected, to the extent possible, from among the "officers, directors and employees of the Tribune Company" in the case of McCormick, and from among the "officers, directors and employees of the News Syndicate Co., Inc." in the case of Patterson. (The News Syndicate Co., Inc. is the publisher of the New York News and is a Tribune Company enterprise.) Since the inception of the trust all trustees have in fact been selected from the executive ranks of the company or its wholly owned subsidiaries. Seven of the present eight trustees are directors of the Tribune Company; Ruth E. M. Tankersley, the eighth trustee, was a company director until April 2, 1973 when she resigned from the board. Her husband, Garvin Tankersley, succeeded her on the board of directors. By its terms, the McCormick-Patterson Trust will terminate on April 1, 1975.[1]

In 1972 the Tribune Company board of directors unanimously recommended that the stockholders adopt certain amendments to the certificate of incorporation and bylaws of the company. Three of these amendments are the basis of this suit. The first provides that the company board of directors shall be elected in three classes to serve staggered three year terms, the term of one of the classes to expire each year.[2] Previously the fourteen member board was elected annually as a single group. This plan is to be implemented by electing one class of directors to a one year term, a second class of directors to a two year term, and a final class of directors to a three year term. Thereafter one class is to be elected each year to a three year term.

The second disputed amendment prohibits the company from entering into any business combination with any party who directly or indirectly owns more than ten percent of any class of stock of the company unless the proposed combination receives the approval of eighty percent of the total outstanding voting securities.

The third amendment increases the total number of authorized shares of common stock from 8,000 shares to 20,000,-000 shares. Under this amendment the 8,000 shares will be reclassified as Series A common stock, retaining all rights previously accorded them by law, except as otherwise provided in the certificate of

---

1. The trust provides that it will expire twenty years after the death of the survivor of Joseph Medill Patterson and Robert R. McCormick. McCormick survived Patterson and died on April 1, 1955.

2. These classes are to be as nearly equal as possible, according to the proposed amendment. Although the proxy statement indicated that each class will have "three or four members," it is clear that this was simply an error and that to elect fourteen members in three classes, two classes will have to have five members and one class have four.

incorporation and subject to the effects of subsequent issuance of additional stock in the same or different series. This amendment also authorizes the board of directors to determine the voting rights and other rights of every series of company stock by simple resolution. Thus, the board may have power under this amendment to alter the rights of presently outstanding shares.

In March 1973 company stockholders received notice of the proposed amendments through a proxy statement circulated with the notice of the annual meeting of stockholders. This proxy statement was also circulated to the beneficiaries of the trust along with a letter informing them that the trustees believed the amendments to be in the best interests of all concerned parties, including the beneficiaries of the trust. The letter indicated that the trustees intended to vote all shares held by the trust in favor of the proposed amendments.

Shortly thereafter, on March 30, 1973, defendant beneficiaries[3] wrote to the trustees to register their objections to the amendments. The thrust of their objections was that the amendments would have the effect of reducing the marketability of the shares held in trust when these shares were distributed to the beneficiaries in 1975. They urged postponement of any vote on the amendments until after the termination of the trust.[4]

Soon after receiving the letter, on April 6, 1973, plaintiffs filed this suit. The suit was intended to preempt, if possible, any legal action by defendants to block the amendments. In fact, defendants did file suit against three trustees[5] in the Supreme Court of New York, New York County, later in the day on April 6. On April 9, 1973 plaintiffs petitioned the district court for an order restraining themselves as trustees from voting on the proposed amendments until a mail canvass of the beneficiaries could be taken regarding their preferences as to the adoption of these amendments.[6] This petition was granted. On

---

3. Defendants are two of approximately 151 beneficiaries of the trust. Joseph M. P. Albright is a citizen and resident of the District of Columbia; his mother, Josephine Albright, is a citizen and resident of Vermont.

4. The pertinent part of the letter read:

As is candidly stated in the proxy statement, the purpose of at least some of the proposed amendments, is to insure continuity of management and discourage any attempts to change management. This will necessarily decrease the value of the Tribune Company shares which are to be distributed to the Trust beneficiaries upon termination of the Trust in 1975 since the ability to sell shares to a person interested in changing, and perhaps improving, management will be limited. The proposed amendments will also substantially increase the Tribune Company's liability for Delaware franchise tax, eliminate the possibility of New York Stock Exchange listing (assuming there is a public offering of Tribune Company shares and such a listing would otherwise be available) and make the shares generally less attractive to a prospective purchaser by reason of the very broad authority to be granted to the board of directors to alter voting and equity rights without shareholder approval.

We do not intend this to be an exclusive list of objections to the proposals. It seems clear to us that the proposals are not in the interests of the stockholders or the Trust beneficiaries who are not members of management. The McCormick-Patterson Trustees are necessarily in a conflict of interest position with respect to the proposed amendments and we believe the only appropriate course for the Trustees to follow is to have the proposed amendments withdrawn at this time and allow the usual process of shareholder votes to determine the manner of electing directors, changes in authorized shares and other charter amendments to take place in due course after the termination of the Trust, when the Trust beneficiaries will be empowered to vote their own shares.

5. Under the trust agreement the trustees are divided into two groups: the successors to Patterson (three trustees) and the successors to McCormick (five trustees). Each of these groups has one vote on trust matters. Defendants' suit was brought against the three trustees controlling the Patterson vote. Injunctive relief against these trustees would have effectively precluded action by the trustees on the proposed amendments.

6. Some controversy exists concerning the nature of the hearing which preceded this order. Although defendants have characterized the hearing as "ex parte," it does appear that defendants were represented at the hearing by competent counsel, and defendants appear to have admitted as much during subsequent argument before the district court.

April 11, 1973 the Supreme Court of New York denied defendants' motion for preliminary injunction and stayed all further proceedings pending resolution of this suit.

Defendants initially filed a motion to dismiss plaintiffs' complaint on the ground that the district court had no jurisdiction over the defendants, who were citizens of Vermont and the District of Columbia. This motion was ultimately denied. Tankersley v. Albright, 374 F.Supp. 530 (N.D.Ill.1973). Defendants then answered the complaint and filed seven counterclaims. The complaint and counterclaims were considered in two related memorandum opinions. Tankersley v. Albright, 374 F.Supp. 538 (N.D.Ill.1974); Tankersley v. Albright, 374 F.Supp. 551 (N.D.Ill.1974). Summary judgment was granted on the original complaint in favor of the plaintiffs and all of the counterclaims were dismissed or ruled against summarily.

In the final judgment order the district judge vacated the order of April 9, 1973 which had restrained plaintiff trustees from taking action on the disputed amendments. Defendants sought an injunction pending appeal which was denied by the district court and by this court. On April 9, 1974 the trustees voted all trust shares in favor of the proposed amendments and in addition participated in the election of three classes of company directors. In that election trustee James J. Patterson and Garvin E. Tankersley, husband of trustee Ruth E. Tankersley, were elected to one year terms; trustees F. M. Flynn, H. F. Grumhaus, W. D. Maxwell, and J. Howard Wood were elected to two year terms; and trustees W. H. James and F. A. Nichols were elected to three year terms.[7]

## II

Plaintiffs' complaint alleged in pertinent part that (1) defendants were two of the trust's approximately 145 beneficiaries; (2) as trustees and as directors of the company plaintiffs had long considered amending the certificate of incorporation of the Tribune Company "for the purpose of protecting and enhancing the value of its stock and to the advantage of both the Trust and the Tribune Company"; (3) plaintiffs had consulted with business, legal, accounting, underwriting, and other experts in considering such amendments; (4) plaintiffs intended to vote all trust shares in favor of the proposed amendments; (5) defendants had by letter on March 10, 1973 expressed objections to the amendments, indicating their belief that a vote in favor of the amendments would constitute a conflict of interest and breach of plaintiffs' fiduciary duties; and (6) the trust agreement evidences "by clear and unequivocal language" that plaintiffs have "the right, power and duty to vote in favor of the amendments." Attached to the complaint was a group of exhibits consisting of a copy of the trust agreement; copies of the notice, proxy statement, and proxy which were sent to the shareholders relating to the proposed amendments; a copy of the trustees' letter to the beneficiaries advising them of the trustees' intention to vote in favor of the amendments; and a copy of defendants' letter protesting the amendments. The complaint asked for a declaration that plaintiffs were legally empowered to vote the trust shares in favor of the proposed amendments, that the plaintiffs would have no conflict of interest in doing so, and that defendants had no right to interfere with plaintiffs in the exercise of their judgment as trustees at the 1973 annual meeting of stockholders or any adjournments thereof.

Immediately upon the resolution of the jurisdictional battle, plaintiffs moved for summary judgment on their complaint. In support of their motion plaintiffs filed several affidavits. The affidavit of Cary Ann Bechley related to the history of the trust, the traditional and intended relationship between the man-

7. In all, five directors were elected for a one year term, four for a two year term, and five for a three year term.

agement of the trust and the management of the company, and the facts leading up to this lawsuit. The identically worded affidavits of two investment bankers stated that their respective companies had recommended the adoption of the amendments and that the amendments would best serve the interests of the company and its shareholders, including beneficial shareholders. The affidavits of three of the trustees stated that they would not accept election to a three year term on the company board of directors and would prefer election to a one year term. A final affidavit indicated that in a mail poll conducted by the trustees 92.6% of the trust corpus was voted in some manner favorably to the proposed amendments. Votes were taken on a prepared form which was to be signed by each beneficiary. The form itself does not appear in the record, although it is clear that each beneficiary did receive a copy of the defendants' letter of March 30, 1973 and a letter from the trustees indicating that they believed the protest to be without merit.

The defendants filed a counteraffidavit signed by Claire V. Hansen, an investment analyst. Hansen stated that in his opinion the amendments would have the effect of reducing the value of the shares being held in trust by at least twenty-five percent due to the fact that the amendments would make it more difficult for an outside investor to gain control of the company and elect a majority of the board of directors. Hansen also pointed out that the antimerger provision could well give present management the power to block a merger proposal beneficial to stockholders generally unless employment agreements or other inducements were provided to obtain their required approval. Finally, Hansen noted that in his opinion these amendments would remove the needed incentive provided by a situation where directors face a realistic threat of replacement, and further pointed out that the 1972 figures on return on average common equity for the company showed a rate of return well below similar rates for seven companies in the publishing and broadcasting field regularly followed by Hansen's firm.

In ruling on the motion for summary judgment the trial judge construed the complaint as placing at issue not only the power of the trustees to vote the shares held in trust, but the propriety of voting these shares in favor of the proposed amendments as well. Thus, after determining that the amendments were of a type generally permitted under Delaware law, the judge went on to characterize the "primary issue" as being "whether plaintiffs have breached the trust imposed upon them as voting trustees." 374 F.Supp. at 543. In resolving this question in the negative, the district judge made specific observations on a number of essentially factual questions:

In summary, the record establishes that the proposed amendments are valid under Delaware law, are by no means new or unusual corporate provisions, and have been overwhelmingly approved by Company shareholders, who have been fully apprised of their nature and effect. Further, adoption of these amendments will not perpetuate the Trustees as controlling directors, and, to the extent that a conflict of interest is present, it does not preclude the Trustees from voting for the amendments, as the settlors purposely created this conflict and the plaintiffs have acted in good faith in recommending the corporate changes. 374 F.Supp. at 546.

Since the plaintiffs already have voted the trust shares in favor of the challenged amendments, the real question in this appeal is the ability of the beneficiaries to seek relief of any kind against the trustees based on self-dealing or other improper motivation in the adoption of the amendments.

■■ We cannot say that these exhibits and affidavits (or any other materials properly before the trial judge when he ruled on plaintiffs' motion for summary judgment) foreclosed any genuine issue regarding plaintiffs' good faith in proposing the disputed amend-

ments.[8] Nor indeed can we say that these materials are conclusive with regard to whether these amendments, as a practical matter, will perpetuate the trustees as controlling directors of the company. The question of the "nature and effect" of the amendments is still an open issue. Close relationships between plaintiff trustees and other board members may well affect the potential impact of the staggered election provisions.[9] Similarly, if present management owns or controls twenty percent of the outstanding company stock, the antimerger provision will have a far greater impact on management-stockholder power relationships than would otherwise seem apparent.[10] While it is entirely possible that the plaintiffs had the purest motives in proposing these amendments and did so only because the investment banking firms recommended this course of action, it may also be that plaintiffs realized company returns were low and sought to insulate themselves and other board members from removal as a result of poor management.[11] There are other possibilities.

■ The order of the district court granting plaintiffs' motion for summary judgment must be reversed. While we do not question that the amendments in issue here are legal in the sense that they do not prima facie constitute a violation of Delaware corporation law,[12] and while we recognize that the trustees have the power under the trust agreement to vote all stock held by the trust, we are unable to agree that the record before the district court was sufficient to support summary judgment as to the good faith of the trustees, the validity of the poll of the beneficiaries and stockholders, or the practical effect of the disputed amendments in the circumstances of this case.

### III

### A

■ Defendants' first two counterclaims charge that plaintiffs have used their positions with the company and with the trust to further their own interests at the expense of both the beneficiaries and the trust and the other stockholders. Broadly read, the counterclaim charges the following acts by plaintiffs: (1) using their positions with the trust and the company to obtain for themselves beneficial interests in the trust at less than the fair value of those interests; (2) failing to cause the company to split its outstanding stock or to

8. In order to justify a summary judgment on these issues, plaintiffs were required to show "the absence of any genuine issue of fact." Adickes v. S. H. Kress & Co., 398 U.S. 144, 153, 90 S.Ct. 1598, 1606, 26 L.Ed.2d 142 (1970). This burden is a heavy one, especially in cases in which intent and motivation play a major role. Poller v. Columbia Broadcasting System, 368 U.S. 464, 472–73, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Illinois State Employees Union Council v. Lewis, 473 F.2d 561, 565–66 (7th Cir. 1972). Here, plaintiffs have not submitted any materials which bear directly upon the issue of their motivation in proposing the amendments. Even if the affidavits of plaintiffs' experts were given full credence, and they need not be, Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 626–28, 64 S.Ct. 724, 88 L.Ed. 967 (1944), they would not show conclusively that the amendments were offered in good faith.

9. Even if an entirely new group of five directors were to be elected at the 1975 annual stockholders' meeting, plaintiffs would retain six of the fourteen board positions through 1976. Close relationships with two of the three nonplaintiff directors who were elected to three year terms could preserve control in the remaining plaintiffs through 1976 despite a drastic change in the shareholder sentiment.

10. Under the proposed amendment, twenty percent of the company stockholders could successfully block a merger or tender offer involving an "interested party." This term is defined to include "any person, firm or corporation, or any group thereof acting in concert which owns of record or beneficially, directly or indirectly, more than 10% of any class of stock of the corporation."

11. As Judge Stevens has observed, it is not for the district judge to accept or reject either party's "version of the facts" on a motion for summary judgment. Illinois Employees Union Council v. Lewis, 473 F.2d 561, 565–66 (7th Cir. 1972). It is enough if, as here, two "versions" remain possible after all appropriate materials submitted with and against the motion have been considered.

12. See 8 Del.Code Ann. §§ 141(d), 151(a), 216, 242(a)(3).

cause a stock dividend in order to make the outstanding shares virtually unmarketable;[13] (3) keeping information from the beneficiaries of the trust and from stockholders generally which is necessary for an informed determination by these people of the value of their interests in the trust and the company; (4) using the resources of the company to purchase and operate businesses in order to create positions and compensations for themselves, and continuing to maintain and operate these businesses at a loss to the company; and (5) proposing and aiding in the adoption of the disputed amendments for the purpose of reducing the value of the shares to be held by the beneficiaries on termination of the trust and thereby to avoid the threat of immediate removal from office in favor of more efficient management. These pleadings were at least partially bolstered by the affidavit of Claire V. Hansen. In his affidavit Hansen pointed out that company returns to shareholders were below those of other comparable companies and that the disputed amendments would remove or substantially reduce the chance of replacement of management, and would drastically lower the market value of the company shares to be distributed to the trust beneficiaries.

■ Summary disposition of these claims either under Rule 12(b) or under Rule 56 was plainly improper.[14] Counterdefendants are clearly appraised of the nature of the claims against them.[15] The question of their good faith in managing the company and administering the trust in the way that they have is central and remains in substantial dispute. Defendants know whether or not they have obtained shares in the company or in the trust for less than fair value and whether they have misused their control of the company and its subsidiaries to feather their own nests as counterplaintiffs allege. They have near exclusive control of company and trust records which substantiate or refute these claims.[16] Under these circum-

13. While plaintiffs and the district judge consider this claim to be in conflict with defendants' opposition to the proposed amendment authorizing additional shares, there is distinct ground for difference here. What defendants complain of is failure to split existing stock or to offer a substantial stock dividend thereon. Such a split or stock dividend would not change the relative control interests in the company but would merely make units of ownership more marketable. The amendment offered by plaintiffs, on the other hand, goes beyond this and authorizes issuance of new stock in the same or different series to persons other than present stockholders. These shares would have such voting rights and other characteristics as the board of directors should direct, subject only to the limitations of Delaware law, the certificate of incorporation, and stockholder approval in the case of shares issued prior to April 1, 1975. This broad amendment would give the directors power to alter or dilute the voting power of presently outstanding shares without seeking approval of existing shareholders. Thus, while a stock split or stock dividend would work only to the advantage of company shareholders wishing to sell their investment, the proposed amendment would present other, potentially harmful possibilities.

14. Although the trial judge nominally "dismissed" these counterclaims, both in the memorandum opinion and in the judgment order, it is clear from his rather abbreviated discussion of these claims that the "conflict of interest" and "self-dealing" aspects were decided on the same resolution of the facts that supported the summary judgment on plaintiffs' original complaint. 374 F.Supp. at 546. We reject the resolution of these factual issues for the reasons previously stated in section II of this opinion.

In addition, the trial judge held that the allegations with regard to obtaining trust interests at below market value and with regard to the operation of failing businesses in order to create and preserve personal sources of income were "vague and conclusory" and "insufficient to require an answer." Id. No cases are cited for this disposition, but reference is made to Fed.R.Civ.P. 8(b). Rule 8(b) has to do with defenses and form of denials, and is clearly irrelevant to the evaluation of these claims. Rule 9(b) may well be the intended reference, but this rule is also irrelevant since the claims in issue do not involve fraud or mistake, and since Rule 9(b) specifically allows mental condition or intent to be averred generally.

15. [A]ll the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. Conley v. Gibson, 355 U.S. 41, 47–48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957).

16. As this court noted in Carroll v. Morrison Hotel Corp., 149 F.2d 404 (7th Cir. 1945), Rule

stances we cannot say that failure to allege details of specific transactions precludes litigation beyond the pleading stage. The various discovery devices available under the Federal Rules of Civil Procedure provide ample opportunities for narrowing and particularizing these claims.

### B

■ In their third counterclaim defendants seek to have the trust declared invalid and immediately dissolved, with the company stock held by the trust distributed to the beneficiaries. They base this claim on statutes of Illinois and Delaware which limit the permissible life of a voting trust to a period of ten years. Ill.Rev.Stat. ch. 32, § 157.30a; Del.Code Ann. tit. 8, ch. 1, § 218. Plaintiffs contend that these statutes do not apply to this trust under the circumstances. Because we believe that a full resolution of the question of the trust's validity would intimately involve the rights of all beneficiaries of the trust,[17] and because these people were never joined or given an opportunity to join, the resolution of this issue by the trial judge is vacated and the claim remanded for application of Rule 19, Fed.R.Civ.P., prior to a full inquiry into this question.[18]

■■ A now-famous law review article identified three classes of interests which are served by the application of Rule 19's joinder provisions: "(1) the interests of the present defendant; (2) the interests of potential but absent plaintiffs and defendants; (3) the social interest in the orderly, expeditious administration of justice."[19] These interests

---

11, Fed.R.Civ.P., provides that the signature of the attorney preparing the complaint "is a certificate that 'to the best of his knowledge, information, and belief' there appears to be good ground to support the pleading" even if particular facts cannot be alleged in support of each element of a claim. *Id.* at 406. Where pleadings concern matters "peculiarly within the knowledge of the defendants," conclusory pleading on "information and belief" should be liberally viewed. *Id.*

**17.** Plaintiffs' original complaint and defendants' other claims do not so directly affect these rights since remedies may be fashioned on these other claims which do not necessarily require change in the administration or threaten the very existence and legality of the trust.

**18.** Rule 19 reads in pertinent part:

(a) *Persons to be Joined if Feasible.* A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper

case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

(b) *Determination by Court Whenever Joinder not Feasible.* If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

**19.** Reed, Compulsory Joinder of Parties in Civil Actions, 55 Mich.L.Rev. 327, 330 (1957). This article was cited and its organization adopted by Mr. Justice Harlan in Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1958), the latest and most authoritative discussion of Rule 19 by the Supreme Court. Although *Provident* dealt primarily with a determination of indispensability under Rule 19(b), a question we need not confront at this juncture, Justice Harlan's thorough analysis of the interests to be considered in applying the rule is instructive in the application of Rule 19(a) as well.

must be weighed and the necessity or indispensability of absent persons determined prior to any consideration of the merits of a case. This is as true at the appellate level as it is in a trial court, at least where the question before the appellate court is one of law only. Here, for instance, before any consideration of the merits of the validity question, we must determine the potential consequences of reaching those merits and of affirming or reversing the trial judge's decision on this issue. Either result would be a distinct possibility since Rule 52(a), Fed.R.Civ.P., does not apply to questions of law,[20] and this court would therefore approach the validity question in much the same posture as would a district court considering this issue de novo.[21]

We turn first to a consideration of the interests of the trustee counterdefendants. Since they prevailed on the validity question in the district court, an affirmance of that decision would present no problem for them. A reversal, however, would raise serious questions as to their authority to take any further actions as trustees, and would leave them with conflicting obligations since their duty to administer the trust would be unaffected as against nonparty beneficiaries. Further, such an adjudication might well prompt nonparty beneficiaries to initiate separate lawsuits involving the trustees aimed at preserving the validity of the trust and/or establishing the legal effect of actions taken by the trustees during the pendency of this appeal. We think these potential consequences outweigh any interest counterdefendants may have in preserving the judgment of the district court. Prior litigation on this claim has not been extensive, other claims are being remanded for further consideration, and joinder of all beneficiaries will assure that the rights of all of the trustees' cestuis que trust will be fully protected.

Looking next to the interests of the nonparty beneficiaries, we see little room in the present claim for shaping of reliefs so as to protect these peoples' rights in the trust, should counterplaintiffs prevail on this issue. The claim seeks to dissolve the trust and presumably to void the adoption of the disputed amendments.[22] Dissolution would of course cut to the heart of the interests of all beneficiaries who would seek to preserve the trust, and any decree limited so as to declare the trust invalid without affect-

---

**20.** Campana Corp. v. Harrison, 114 F.2d 400, 405–06 (7th Cir. 1940); 5A J. Moore, Federal Practice, ¶ 52.03[2] (2d ed. 1953); Wright and Miller, Federal Practice and Procedure 2588.

**21.** The Supreme Court in *Provident* noted that one of the complexities to be considered in applying Rule 19 at the appeal stage is whether "[t]he judgment appealed from may not in fact affect the interest of any outsider even though there existed, before trial, a possibility that a judgment affecting his interest would be rendered." 390 U.S. at 110–11, 88 S.Ct. at 738. In a footnote the Court cited Bourdieu v. Pacific Oil Co., 299 U.S. 65, 57 S.Ct. 51, 81 L.Ed. 42 (1936). In that case it was held that where a bill of complaint plainly failed to state a cause of action against anybody, the fact that "indispensable" parties were not joined did not present a bar to a judgment dismissing the complaint as insufficient:

[S]ince the bill states no cause of action against anyone, the rights of absent parties are in no way threatened by it, and to enter upon a consideration of the question of their indispensability would be a vain waste of time. *Id.* at 71, 57 S.Ct. at 53.

The present case does not concern a dismissal due to insufficiency of the pleadings, but a ruling on the merits of a question of law. While a ruling on sufficiency of a complaint arguably presents no threat to outsiders—they can be joined if the pleadings are held in—a ruling on the merits of a question of law is different since reversal changes the result of the underlying case and does not offer a subsequent opportunity for outsiders to present their views and protect their interests.

**22.** When the suit was initially filed, dissolution would have prevented any action on the proposed amendments, which are the real motivating force in this entire controversy. Since the amendments have since been adopted on the strength of the trust-controlled shares, it is predictable that if counterplaintiffs should succeed in obtaining a judgment that the trust is invalid, they will attempt to attack the legal effect of the trustees' actions in voting in favor of those amendments during the pendency of this appeal. Whether such an attack might prove successful is a question we need not confront.

ing the trust itself or the disputed amendments would be useless to the counterplaintiffs and a futile exercise of this court's jurisdiction.[23] Moreover, we must recognize the practical effect that any adjudication of the validity question would have for those who are not joined and who might later seek to litigate this issue. Quite independent of the doctrine of res judicata, which plainly would not apply in such a suit, principles of stare decisis could have a significant impact, particularly within this circuit. If all beneficiaries are to be afforded a full and unbiased opportunity to be heard on the validity question, it must be in this suit.[24]

Finally, we note that the problems inherent in the validity question are extremely complex. The trust was created in Illinois in 1932 at a time when the validity of voting trusts under Illinois law was somewhat uncertain.[25] The Tribune Company was then an Illinois corporation. In 1947 Illinois adopted a statute specifically authorizing voting trusts but limiting their permissible life to ten years.[26] This statute was made part of the Illinois Business Corporation Act and was at least prima facie applicable to the trust since the Tribune Company was incorporated under the Illinois act. The trust continued in existence until 1968, a full twenty-one years, during all of which time the company continued as an Illinois corporation subject to the provisions of the Illinois Business Corporation Act. In 1968 the company reincorporated in Delaware. The trust continued to be administered in Illinois. The Delaware Corporation Act also includes a provision limiting the life of voting trusts to ten years.[27] Its law has been in effect since 1925. Thus, resolution of the validity issue presents a difficult conflict of laws problem,[28] not to

---

**23.** As Justice Harlan noted in *Tradesmens*, the desirability of tailoring reliefs so as to protect absent parties is limited by the utility of the decree which results:

> An appropriate statement of the question might be: "Can the decree be written so as to protect the legitimate interests of outsiders and, if so, would such a decree be adequate to the plaintiff's needs and an efficient use of judicial machinery?" 390 U.S. at 112 n.10, 88 S.Ct. at 739.

**24.** We recognize the possibility that on remand it may be determined that joinder of all beneficiaries will destroy diversity. In this event an analysis of the indispensability of other beneficiaries under Rule 19(b) will become necessary. While we do not take any position on this question, we do note that the trial judge's excellent analysis of the *Mullane* doctrine would indicate that viable alternative forums may exist, 374 F.Supp. at 535–37, and that counterplaintiffs, who would normally assert any interest in litigating in the district court, actually fought quite vigorously to have this case dismissed on jurisdictional grounds in order to avoid litigating in that forum.

**25.** *See* Note, Statutory Approval of Voting Trusts in Illinois, 42 Ill.L.Rev. 401 (1947). As the author points out, in 1915 the Illinois Supreme Court decided in Luthy v. Ream, 270 Ill. 170, 110 N.E. 373 (1915), that "an agreement the purpose and effect of which are to permit the affairs of the corporation to be managed by the determination of persons other than its stockholders . . . is invalid." *Id.* at 376.

This holding had not been explicitly overruled in 1932, and as late as 1937 distinguished commentators still considered the legality of voting trusts in Illinois an open question. Rutledge, Significant Themes in Modern Corporate Statutes, 3 U.Pitt.L.Rev. 273, 295 (1937).

**26.** The Illinois statute provided in part:

> Any number of shareholders of a corporation may create a voting trust for the purpose of conferring upon a trustee or trustees the right to vote or otherwise represent their shares, for a period of not to exceed ten years . . . . Ill.Rev.Stat. ch. 32, § 157.-30a (1947).

**27.** The Delaware statute provides in part:

> One or more stockholders may by agreement in writing deposit capital stock of an original issue with or transfer capital stock to any person or persons, corporation or corporations authorized to act as trustee, for the purpose of vesting in such person or persons, corporation or corporations, who may be designated voting trustee, or voting trustees, the right to vote thereon for any period of time determined by such agreement, not exceeding ten years . . . . Del.Code Ann. tit. 8, ch. 1, § 218.

**28.** This is especially so since Illinois conflicts law, which controls this case, Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), is in a state of flux. *See* Earle, Conflict of Laws and the Second Restatement—Illinois Accepts the Tort Provisions; What About Contracts? 1973 Ill.B.J. 292.

mention problems regarding retroactivity and the effect of reincorporation in Delaware on the application of either statute. Under these circumstances, "the interest of the courts and the public in complete, consistent, and efficient settlement of controversies,"[29] would also be well served by joinder of all interested parties so that they might contribute to the analysis of these issues.

### C

In their fourth, fifth and sixth counterclaims, defendants charge plaintiff trustees with responsibility for alleged company violations of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78$l$-n, by failing to cause the company to register its stock, file its proxy statements, and disclose material information in connection with the proposed amendments. As a result, it is alleged that the company has become liable to fines or other penalties, and the rights of all beneficiaries and stockholders have been violated. The trial judge rejected these claims after extended briefing and submission of exhibits, affidavits, and other materials. We therefore treat his disposition as a summary judgment on these claims.[30]

■ The district court held that the Securities Exchange Act does not apply to the Tribune Company because the company does not have 500 or more stockholders of record as required by section 12(g) of the Act, 15 U.S.C. § 78$l$.[31] The decision was based in large part on a determination that the trust known as Tribune-News Employees Trust is an ordinary trust under SEC Rule 12g5–1.[32] This rule provides that an ordinary trust shall be considered the single holder of record of all securities in its corpus. Defendants argued in the district court that the employees' trust is not an ordinary trust, but a "voting trust, deposit agreement or similar arrangement." Rule 12g5–1 requires each individual beneficiary or depositor under such specialized agreements to be counted as a separate holder of record. Our examination of the employees' trust agreement fully supports the analysis of the district court.

The employees' trust was created in 1937. Under the trust agreement, thirty-eight higher level executives of the Tribune Company and its subsidiaries deeded certain units of beneficial interest in the McCormick-Patterson Trust to three trustees. These units of interest in the McCormick-Patterson Trust had been acquired from Robert R. McCormick shortly before the creation of the employees' trust. Under the terms of the trust, the units so conveyed are to be treated in all respects as a single undivided interest in the McCormick-Patterson Trust and the original employee ben-

---

**29.** Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. at 111, 88 S.Ct. at 739.

**30.** The district judge stated that he would treat these counterclaims and the materials submitted thereon as if plaintiff had moved for summary judgment. 374 F.Supp. at 550. But in his final judgment order he "dismissed" all of defendants' counterclaims. Since the memorandum opinion which deals with these three claims clearly rests on a determination that the materials submitted foreclose all material issues of fact, *Id.* at 558, we assume that the district judge intended to enter judgment on the merits of these claims rather than to "dismiss" as that term is used under Rule 12(b)(6).

**31.** Section 12(g) provides in part:

Every issuer which is engaged in interstate commerce, or in a business affecting interstate commerce, or whose securities are traded by use of the mails or any means or instrumentality of interstate commerce shall—

$$* \quad * \quad * \quad * \quad * \quad *$$

(B) within one hundred and twenty days after the last day of its first fiscal year ended after two years from July 1, 1964, on which the issuer has total assets exceeding $1,000,000 and a class of equity security (other than an exempted security) held of record by five hundred or more but less than seven hundred and fifty persons, register such security by filing with the Commission a registration statement (and such copies thereof as the Commission may require) with respect to such security containing such information and documents as the Commission may specify comparable to that which is required in an application to register a security pursuant to subsection (b) of this section.

**32.** 17 C.F.R. § 240.12g5–1.

eficiaries are to lose all right to call for a partition or division of the trust corpus. Provisions in the employees' trust also prohibit any employee beneficiary from transferring or assigning his or her interest in the employees' trust without first successively offering this interest to Robert R. McCormick, Joseph M. Patterson, the president of the board of directors of the Tribune Company, the trustees of the employees' trust, and finally, all of the employee beneficiaries.[33] The trustees of the employees' trust are given significant power and authority in dealing with the trust corpus. They have express power to take any action or give any consent permitted to be taken or given by a beneficiary of the McCormick-Patterson Trust, including actions aimed at extending the life of the McCormick-Patterson Trust. Finally, the employees' trust is to last for the lives of the original benefici-

aries plus twenty-one years unless earlier terminated by the unanimous vote of all beneficiaries and Robert R. McCormick if alive, or Joseph M. Patterson, if alive.[34]

█ These facts and others make it clear that the Tribune-News Employees Trust Agreement was intended to and did create a formal trust rather than a mere shareholder agreement or special agency.[35] Moreover, a consideration of the nature of the corpus of the employees' trust precludes a conclusion that this trust is a voting trust or similar arrangement. There are simply no voting rights involved.[36] Nor can it be said that this trust is merely a device created to avoid having the employee beneficiaries included as shareholders of record of the company as they would be if they individually held interests in the McCormick-Patterson Trust, which is a voting trust.[37] The Tribune-News Employees

---

33. The option is exercisable by any of these parties only "for the benefit of the employees of the Tribune Company and subsidiary companies and the Employee Beneficiaries," and interests so purchased are held subject to resale to other employees nominated by the president of the board of directors of the company to become beneficiaries of the employees' trust.

34. Thus, the life of the employees' trust is in no way tied to the life of the McCormick-Patterson Trust, and in fact the employees' trust specifically provides for continuation beyond the termination of that trust.

35. Plaintiffs had argued that the employees' trust agreement was not a trust at all, but a mere shareholders' agreement. But as the trial judge correctly observed:

Defendants' evaluation of the Employees Trust, however, is inaccurate, for that agreement satisfies all the essentials of a formal trust. The instrument contains a declaration of trust by the employees for their benefit, and recites consideration. Units of beneficial interest in the M-P Trust comprise the trust corpus. Three of the original employee-participants are declared, and accepted appointments as, trustees. The beneficiaries are identified, and, finally, the duties and powers of the trustees are enumerated. See Richie, Alford & Effland, Decedents' Estates and Trusts 380–414 (4th ed. 1971). In light of these characteristics, it is clear that the Employees Trust is an ordinary trust. 374 F.Supp. at 555.

36. The employees' trust agreement does provide that if the McCormick-Patterson Trust should terminate prior to the termination of the employees' trust, the trustees of the employees' trust shall hold the Tribune Company stock due the holder of the "aggregate interest" as trustees, with power to vote such stock. We need not consider at this point whether the employees' trust would in that event become a voting trust; we are convinced that at this time the employees' trust is not such a trust.

37. The trial judge determined that the McCormick-Patterson Trust is a voting trust. We agree. By its terms the trustees are fully empowered to vote all shares of stock held by the trust. The beneficiaries retain virtually complete enjoyment of all other beneficial incidents of ownership of the company stock represented by their interests in the trust corpus, subject only to normal provisions to protect the trustees from liability for mistaken transfers of trust interests and to insure that the trust can continue to function smoothly and to meet its expenses in a timely fashion. The separation of voting rights from the other aspects of beneficial ownership is for a stated and definite period of time, and is irrevocable except by extraordinary vote of the beneficiaries to terminate the trust. The manifest purpose of the trust is to insure continuity in management of the company through the maintenance of voting control in a select group of persons. See Bogert, Trusts & Trustees § 251 (2d ed. 1964); id. § 1192 (2d ed. 1969); Tankersley v. Albright, 374 F.Supp. at 547–48.

Trust was created prior to the adoption of Rule 12g5–1 and clearly serves other important purposes. For the original beneficiaries it provided an incentive to work diligently to increase company production and to stay in the employ of the company, since any beneficiary leaving the company is required by the trust agreement to offer his or her beneficial interests in the trust to various option purchasers. In addition, by strictly limiting the assignability of its beneficial shares, and by including successive options to purchase back shares for sale to other employees, the employees' trust provides a continuing plan under which promising new employees can be offered an opportunity to share in company growth.[38] We therefore conclude that the Tribune-News Employees Trust is a formal trust which should be counted as a single shareholder of record under Rule 12g5–1.

Defendants also raise issues concerning a possible increase in shareholders of record due to distributions under wills, divisions of interests under trusts, and misuse of nominee registrations. In all, fifty-four possible unacknowledged shareholders of record are suggested under these theories. We need not rule on these issues, however, since it is clear that even if defendants were to prevail on each of these contentions, they would fall short of the 500 stockholders necessary to trigger application of section 12g. Tribune Company books show 253 stockholders of record independent of defendants' contentions regarding wills, trusts, and nominees. Defendants have had full access to pertinent records of the company, and have never suggested that 247 additional stockholders could be found through further examination of these records. As the district judge recognized, defendants' failure to prevail on the employees' trust issue is fatal to their claims under the Securities Exchange Act. Summary judgment was proper as to counterclaims four, five, and six.

### D

In their final counterclaim defendants allege that the McCormick-Patterson Trust has been in existence for over forty years but that plaintiffs have never provided to the beneficiaries a full accounting of their activities as trustees and directors during this time. There is no allegation of any demand for an accounting and no allegation that the records kept by plaintiffs—which are made available to all beneficiaries under the trust agreement—are inadequate or that defendants have been denied access to these records.[39] Nor is there any allegation in this counterclaim of wrongdoing or impropriety save for the failure of trustees to provide an accounting voluntarily.[40] Defendants have not briefed this issue on appeal, and no cases have been cited which would require an accounting on these sparse allegations. We agree with the district judge that

**38.** We need not decide whether these attributes make this an "employee plan" within the meaning of that term as used in Securities Exchange Act Release No. 34–7492 (Jan. 5, 1965), 30 Fed.Reg. 483. Our determination that this is an ordinary trust rather than a voting trust, deposit agreement, or similar arrangement is conclusive as to the status of the employees' trust under section 12(g).

**39.** The right to an accounting by order of court in cases of this character is not an absolute right, but is one which should be accorded only on equitable principles. It will not be ordered if the circumstances are such as to make an accounting unnecessary or improper. . . . A demand and refusal are necessary to be alleged and proved in order to maintain such a suit. Patterson v. Northern Trust Co., 170 Ill.App. 501, 516 (1st Dist. 1912).

See also American Sanitary Rag Co. v. Dry, 346 Ill.App. 459, 463, 105 N.E.2d 133 (1st Dist. 1952). Here there is no pleading of a demand or of necessity. Moreover, it is clear that a full accounting will be had on termination of the trust on April 1, 1975.

**40.** While count seven therefore fails to state a claim sufficient to support an accounting, it is clear that the conflict of interest and self-dealing counts, coupled with the general prayer for relief, will support an accounting if these claims are proven. Haworth v. Taylor, 108 Ill. 275, 287 (1884); cf. Haldash v. Widlak, 23 Ill. App.2d 313, 162 N.E.2d 599 (1st Dist. 1959) (abstract—full opinion not published).

this counterclaim presents no grounds on which an accounting could be ordered.

The summary judgment entered in favor of plaintiffs on the original complaint is reversed insofar as that judgment resolves the issues of plaintiffs' good faith, the validity of the poll of the beneficiaries, or the practical effect of the proposed amendments. Summary judgments as to counts one and two of defendants' counterclaims are reversed. Summary judgment as to count three of the countercomplaint is vacated, and the judgments as to counts four, five, six, and seven are affirmed. This case is remanded for further proceedings consistent with this opinion, and pursuant to the provisions of Circuit Rule 23.

HASTINGS, Senior Circuit Judge (concurring in part and dissenting in part).

I agree with and concur in Part III, C and D, of the majority opinion wherein our court affirms the summary judgments below on defendants' counterclaims four, five, six and seven in favor of the plaintiffs-counterclaim defendants.

I respectfully dissent from the result of the remainder of the majority opinion wherein our court reverses the summary judgments below in favor of plaintiffs on their complaint and counts one and two of defendants' counterclaim and vacates the summary judgment in favor of plaintiffs on count three of defendants' counterclaim.

In sum, I would affirm the judgment below *in toto.*

This litigation in the district court resulted in three well-considered memorandum decisions by Judge Bernard M. Decker. Tankersley v. Albright, N.D.Ill., 374 F.Supp. 530–537 (July 11, 1973), denied defendants' motion to dismiss this action for lack of personal jurisdiction. I understand the majority here does not disagree with this result.

Tankersley v. Albright, N.D.Ill., 374 F.Supp. 538–551 (Feb. 5, 1974) and Tankersley v. Albright, N.D.Ill., 374 F.Supp. 551–558 (March 5, 1974), when read to-gether reach the final results treated in the majority opinion. I am persuaded by the thorough and careful analysis of the underlying factual background and the considered treatment of the relevant issues and applicable law found therein. Since at this time it appears the McCormick-Patterson trust will terminate on April 1, 1975, I shall be content to rest my partial dissent upon the authority of these three opinions of the district court.

Summary judgment procedure was intended to serve a salutary purpose to meet a recognized need when it was devised. With deference, I cannot escape the conclusion that, not only in this circuit, but elsewhere, it has become so increasingly difficult to sustain a summary judgment on appeal that all of us are contributing to its untimely demise. Many outstanding members of the bar have expressed similar feelings.

Finally, since there was no trial of this case below on the merits, I respectfully disagree that the remand is subject to the strictures of our Circuit Rule 23. At this late hour I cannot see any justification for ordering that this complex litigation be dumped in the lap of another district judge.